# Arthur Ray Jenkins, III

### v.

# Commonwealth of Virginia

Record Nos. 920566 and 920567

November 6, 1992

Present: All the Justices

*J. Lloyd Snook, III (William B. Allen, III; Snook & Haughey; Allen & Allen,* on briefs), for appellant.

*Janet F. Rosser, Assistant Attorney General (Mary Sue Terry, Attorney General; Margaret Ann B. Walker, Assistant Attorney General,* on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

On October 12, 1990, Lee H. Brinklow and Floyd L. Jenkins were murdered in their residence in rural Warren County. The next day, defendant Arthur Ray Jenkins, III, also known as Arthur Ray Frame, was apprehended in Washington County.

Subsequently, the defendant, a nephew of Floyd Jenkins, was charged in an eight-count indictment with the following crimes arising out of the October 12 incident: (1) capital murder for the willful, deliberate, and premeditated killing of more than one person as a part of the same transaction, Code § 18.2-31(7); (2) murder of Brinklow, Code § 18.2-32; (3) capital murder for the willful, deliberate, and premeditated killing of Jenkins in the commission of robbery, Code § 18.2-31(4); (4) capital murder for the willful, deliberate, and premeditated killing of Brinklow in the commission of robbery, *id.* (5) robbery of Jenkins, Code § 18.2-58; (6) robbery of Brinklow, *id.*; (7) use of a firearm while committing the murder of Jenkins, Code § 18.2-53.1; and (8) use of a firearm while committing the murder of Brinklow, *id.*

Following several pretrial hearings, including hearings on defendant's motion to suppress certain statements he made to the police, defendant was tried by a single jury in June 1991. As the trial began, the court granted the prosecutor's motion to *nolle prosequi* count 2; the defendant pled guilty to count 8, and the court subsequently sentenced defendant to two years' imprisonment for that offense.

After four days of trial, the jury found defendant guilty on the remaining charges and fixed the following punishments for the noncapital offenses: life imprisonment for each robbery conviction and two years' imprisonment for felonious use of a firearm. The jury also found defendant guilty of three charges of capital murder.

During the second phase of the bifurcated capital proceeding, the jury fixed defendant's punishment at death for each capital offense based upon the vileness and future dangerousness predicates of the capital murder sentencing statute. Code § 19.2-264.4. Upon the

Commonwealth's motion, the court then dismissed count 3. Subsequently, the trial court considered a probation officer's report and heard additional evidence relevant to punishment. The court then sentenced the defendant to death for each of the two capital murders.

The death sentences are before us for automatic review under Code § 17-110.1(A), *see* Rule 5:22, and we have consolidated this review with defendant's appeal of the capital murder convictions. Code § 17-110.1(F). In addition, by order entered in April 1992, we have certified the appeals of the noncapital convictions from the Court of Appeals; the effect of the certification is to transfer jurisdiction over the noncapital appeals to this Court for all purposes. Code § 17-116.06(A). We have consolidated those appeals (Record No. 920567) with the capital murder appeals (Record No. 920566). As required by statute, we will consider not only the trial errors enumerated by the defendant but also whether the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentences are excessive or disproportionate to the penalty imposed for similar cases. Code § 17-110.1(C).

There is virtually no conflict in the facts relating to the commission of these crimes. The defendant has not denied committing the homicides. Indeed, he admitted the killings to almost everyone with whom he talked subsequent to the day in question. Where there is any conflict, however, we shall construe the facts in the light most favorable to the Commonwealth, as required by settled rules of appellate procedure.

During October 12, the day the crimes were committed, the defendant, age 21, had been drinking whiskey and beer with his younger brother, Kevin Frame. In the early evening, defendant engaged in a fight with another man outside a local restaurant. The defendant's mother and grandmother drove the defendant and Frame away from the restaurant and to the vicinity of the home where defendant was residing on Route 617 in Warren County. The defendant had lived there for about one month following his release from prison on September 6, 1990. The home was owned by Elizabeth Morris, defendant's aunt. Brinklow, age 69, and the uncle, Floyd Jenkins, age 72, also lived in the house.

Near 10:00 p.m., defendant and Frame entered the home through the front door. Brinklow was sitting on a couch in the living room. Brinklow told Frame to leave the house because the aunt, who was

not present, did not allow Frame inside. An argument ensued between Brinklow and the defendant. The defendant went to Brinklow's bedroom, obtained a .22 rifle capable of firing only one shot at a time, and returned to the living room. The defendant loaded the rifle and shot Brinklow once in the face; the shot did not kill him.

The defendant walked to the "back bedroom" where the uncle was lying in bed listening to a radio. After the defendant reloaded the rifle, he "stuck it" to the uncle's head. The uncle "grabbed it" and defendant said, "Let go before I kill you." The uncle "let go" and the defendant "stuck the gun to his head" and shot him. The uncle began "gagging," and defendant returned to the living room.

The defendant asked Brinklow the location of Brinklow's hand gun, and Brinklow responded that the weapon was in Brinklow's pick-up truck parked outside the house. Ordering Frame to "watch" the uncle, defendant "took" Brinklow to the truck, where the hand gun could not be located.

Defendant escorted Brinklow back into the house where defendant went to the kitchen and procured two "butcher knives." Defendant gave one to Frame and retained the other.

Defendant returned to the uncle's bedroom where he was still "gagging." By this time, Brinklow had been brought into the same bedroom where he laid on the floor. Defendant shot the uncle again in the head and "went berserk." He began stabbing the uncle with the knife until his "guts came out."

As defendant was picking up the "guts" and throwing them onto the uncle's body, Frame said, "Shoot him," referring to Brinklow. Brinklow pleaded with defendant not to kill him, stating that he "loved" defendant. Defendant "stuck" the rifle to Brinklow's head and "pulled the trigger."

The defendant and Frame carried the victims' bodies out the front door of the house and laid them in the bed of Brinklow's truck. The defendant and Frame returned to the house where they broke into the aunt's locked bedroom. The aunt had stored sums of money in various items in her bedroom; these items, with the money, were loaded into the truck. The evidence also showed that, at some point, defendant and Frame took the victims' wallets as well as other personal items.

Defendant drove the truck away from the house, intending to drive "to the police station." Frame persuaded defendant to turn in a different direction as they left the premises. A short distance from

the residence, defendant lost control of the truck, which left the road and came to rest in a creek.

Defendant and Frame walked back to the home and attempted to clean the rooms, which were spattered with blood and contained body parts. The pair then left the premises, and defendant fled to the southwestern part of the State.

The aunt returned to her home about 1:50 a.m. on October 13 to find it in disarray and her funds missing. A short time later, the truck containing the victims' bodies was found by the police. Defendant was arrested about 11:30 p.m. on that day near Abingdon.

Autopsies of the victims' bodies showed that Brinklow sustained four gunshot wounds to the head, two of which were fatal. The uncle sustained three gunshot wounds to the head, two being fatal. He also sustained seven stab wounds to the abdomen, which injured vital organs and which penetrated the body up to a depth of eight inches.

■ On appeal, defendant assigns 26 alleged errors committed by the trial court. The defendant has not briefed or argued eight (Nos. 6, 7, 13, 14, 15, 17, 19, and 21) of those assigned errors; hence, we will not consider them. *Quesinberry* v. *Commonwealth*, 241 Va. 364, 370, 402 S.E.2d 218, 222, *cert. denied*, 502 U.S. ___, 112 S.Ct. 113 (1991).

The remaining assignments of error present questions generally dealing with the validity of Virginia's capital sentencing statute, the admissibility of certain statements defendant made to the police, the limitation of certain testimony offered on behalf of defendant, refusal of certain jury instructions, alleged prosecutorial misconduct, and alleged juror misconduct.

■ First, defendant contends that Virginia's "capital sentencing statute is unconstitutional as being overbroad and vague, and because of its racially discriminatory application." This contention has been answered repeatedly by our previous decisions. *See Satcher* v. *Commonwealth*, 244 Va. 220, 227-28, 421 S.E.2d 821, 826 (1992). Thus, we reaffirm these decisions and reject defendant's contention.

Next, defendant argues that "various statements" made by defendant to investigating officers were obtained in violation of his constitutional rights. This argument refers to statements made to a Washington County jailor on October 14, to Warren County investigators as defendant was being transported to Warren County on

October 14, and to videotaped confessions made on October 15 and 16.

On October 14, while held in the Washington County jail, defendant asked to speak with R.A. Clendenen, Jr., chief administrative officer of the jail. Responding to these requests, Clendenen spoke with defendant on three occasions during the afternoon without giving defendant warnings according to *Miranda* v. *Arizona*, 384 U.S. 436 (1966). Among other things, defendant talked about "the murder that was committed and so forth" and the location of "the gun."

None of the statements made to Clendenen was introduced in evidence during the guilt phase of the trial. Nevertheless, defendant argues they constituted "the first poisoning of the larger tree." We do not agree.

■ The question whether error was somehow committed by receipt of defendant's volunteered information is moot because none of the statements was admitted in evidence, nor was any evidence derived from the conversations admitted. *Smith* v. *Commonwealth*, 239 Va. 243, 253-54, 389 S.E.2d 871, 876-77, *cert. denied*, 498 U.S. 881 (1990). Moreover, as the Attorney General argues, defendant gives no reason why his statements poisoned an otherwise untainted "tree" nor does he identify the supposed "fruit" from those conversations.

■ During the afternoon of October 14, investigators John Lyerly and Paul Kennedy of the Warren County Sheriff's Department arrived at the Washington County jail to drive defendant back to Warren County. Defendant was not given *Miranda* warnings, and the investigators did not question him about the crimes during the seven-hour return trip. En route, however, defendant initiated discussions about the events of October 12 by asking such questions as: "Did you all charge me with capital or what?" and "When did you all find the bodies?" Defendant was very "talkative" and related a number of incriminating facts about the crimes. Lyerly recorded the conversations on audiotape using a concealed tape recorder. Defendant's statements were received in evidence at the trial.

Defendant argues that the trial court erred in refusing to suppress the statements "because they were the product of custodial interrogation without *Miranda* warnings being given." We do not agree.

■ The record supports the trial court's implicit finding that there was no custodial interrogation of defendant during the return trip.

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island* v. *Innis*, 446 U.S. 291, 300-01 (1980). Here, defendant, recognizing that the investigators did not engage in express questioning, contends that their conduct was the functional equivalent of interrogation.

The term "interrogation" under *Miranda* includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnotes omitted). But, the police "do not interrogate a suspect simply by hoping that he will incriminate himself." *Arizona* v. *Mauro*, 481 U.S. 520, 529 (1987).

■ The record shows that defendant initiated conversations about the crimes throughout the return trip and that the investigators merely answered his inquiries in a manner not designed to invoke inculpatory statements. Indeed, at one point during the trip when defendant began talking about theft of the aunt's money, Lyerly attempted to stop him by saying that defendant could relate all the facts when they arrived in Warren County. No effort was made to procure a confession during the trip and the investigators were not required to disregard defendant's voluntary statements.

On October 15 and 16, defendant made lengthy confessions that were recorded on videotape in the presence of Lyerly and Kennedy. The trial court refused to suppress either statement, ruling that they were voluntary. Prior to each statement, Lyerly advised defendant of his rights according to *Miranda* and defendant executed waivers. Both tapes were viewed by the jury in their entirety and were received in evidence. Thus, we have likewise viewed the tapes.

Defendant contends that the October 15 and 16 statements were inadmissible because he "did not knowingly and voluntarily waive his right to counsel and his privilege against self-incrimination." We disagree.

■ Settled principles should be reviewed as we analyze the statements. A defendant's waiver of his *Miranda* rights is valid when the waiver is made knowingly, voluntarily, and intelligently. While the question whether a statement is voluntary is ultimately a legal rather than a factual one, subsidiary factual determinations are entitled to a presumption of correctness. The test for voluntariness is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will

"has been overborne and his capacity for self-determination critically impaired." *Culombe* v. *Connecticut*, 367 U.S. 568, 602 (1961). When determining whether a defendant's will has been overborne, the totality of the circumstances must be examined, including the defendant's experience and background as well as the conduct of the police. *Gray* v. *Commonwealth*, 233 Va. 313, 324, 356 S.E.2d 157, 163, *cert. denied*, 484 U.S. 873 (1987). *See Harrison* v. *Commonwealth*, 244 Va. 581, 423 S.E.2d 160 (1992), decided today.

Focusing on the October 15 statement, the defendant contends that he "was uncertain about whether he should have a lawyer, that he asked Lyerly whether he should have a lawyer, and that Lyerly, improperly, gave him legal advice" when the officer should have answered in "a non-committal way." When defendant asked, as the interrogation began, "Would it help out any" to "have a lawyer here," Lyerly responded: "Well, that depends on whether or not you want to tell the truth."

■ While not agreeing that the statement was involuntary, we will assume, *arguendo*, that the confession should have been excluded and that the waiver was not made knowingly, voluntarily, and intelligently because the investigator's response caused defendant to misunderstand his rights. Nonetheless, any conceivable error in admission of the October 15 confession was harmless beyond a reasonable doubt. *See Milton* v. *Wainwright*, 407 U.S. 371, 372 (1972); *Chapman* v. *California*, 386 U.S. 18, 24 (1967). As we have said, defendant confessed numerous times to many different persons including three close friends, fellow jail inmates, and the investigators during the trip from Washington County to Warren County. Moreover, the October 16 confession, which we shall presently discuss, was as complete and as incriminating as the one on October 15. The jury heard all this testimony and, even if the first confession should be ignored, the jury was presented with "overwhelming evidence" of defendant's guilt. *Milton*, 407 U.S. at 372-73. *See Pearson* v. *Commonwealth*, 221 Va. 936, 944-46, 275 S.E.2d 893, 898-900 (1981).

Targeting the October 16 confession, defendant argues that it was inadmissible as "a continuation of the first interview," and thus the waiver of rights was involuntary. There is no merit to this contention:

■ A subsequent statement made by a suspect after being properly advised of his *Miranda* rights is admissible even though the

suspect has given an earlier unwarned, and inadmissible, statement. "Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." *Oregon* v. *Elstad*, 470 U.S. 298, 309 (1985). *Accord Pruett* v. *Commonwealth*, 232 Va. 266, 272-74, 351 S.E.2d 1, 5-6 (1986), *cert. denied*, 482 U.S. 931 (1987).

The defendant does not attack the adequacy of the *Miranda* warnings on October 16, nor does he contend that the October 15 statement was obtained as a product of coercive tactics. Therefore, the so-called "cat out of the bag" analysis, urged by the defendant, does not apply because the initial statement was not a product of compulsion. "[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318; *Pruett*, 232 Va. at 273, 351 S.E.2d at 5.

Defendant's second videotaped confession, given 24 hours after the first, was accompanied by full *Miranda* warnings. The defendant stated that he understood the warnings and he signed a second waiver form. Our review of the record, including the videotape, convinces us that the second confession was made knowingly and voluntarily and that it was properly admitted in evidence.

Next, we come to alleged errors that are defendant's main thrust on appeal. These contentions arise against the following background. According to defendant, "the crucial question" in the case was not whether defendant "pulled the trigger; the crucial question was his state of mind — both as to the degree of homicide and as to the eligibility of Arthur Jenkins for the death penalty." The defense sought to establish that the defendant had been physically and sexually abused as a child, that the uncle was a party to the sexual abuse, that abused children have a "heating-up period" during which the psychic pain worsens, that the uncle made a sexual proposition by words alone to defendant a day or two before the murders which caused defendant to become enraged, and that defendant's rage was triggered by the proposition because of his mental illness. Consistent with this theory, defendant sought to introduce evidence to demonstrate defendant's provocation as the result of the uncle's proposition and, therefore, to reduce the charge of killing the uncle from murder to voluntary manslaughter.

Defendant, however, did not put his sanity in issue nor present any evidence that he was legally insane. Indeed, defendant never mentioned the alleged past sexual abuse by the uncle, or the recent proposition, to anyone until after he had been referred by his attorneys for psychological evaluation. And, the aunt testified in rebuttal during the penalty phase of the trial that, sometime after the crimes but before trial, defendant stated to her that his attorneys told him to say that the uncle had sexually abused defendant as a child when, in fact, defendant knew that another adult had committed the sexual molestation. Defendant's attorneys denied, however, that they had urged defendant to commit perjury. Accordingly, we will address the merits of defendant's contentions, assuming there is validity to defendant's charge of past sexual misconduct by the deceased uncle.

At trial, defendant sought to introduce the testimony of Dr. Faye E. Sultan, a North Carolina clinical psychologist, who had evaluated defendant at the request of his attorneys. She examined defendant at Central State Hospital in Dinwiddie County, Virginia, eight days before trial. During the penalty phase, defendant proffered her testimony. Sultan would have stated that defendant suffers from so-called "child sexual abuse accommodation syndrome" and that this explains why defendant did not tell anyone about his sexual abuse. Further, Sultan would have testified that defendant fit the behavior patterns and thought processes of one who had been sexually abused as a child.

The prosecutor objected to Sultan's proffered testimony, arguing that the defense was actually attempting to establish a prohibited diminished-capacity defense. The trial court sustained the objection, relying on *Stamper* v. *Commonwealth*, 228 Va. 707, 324 S.E.2d 682 (1985). In *Stamper*, this Court, rejecting a diminished-capacity defense, said that "evidence of a criminal defendant's mental state at the time of the offense is, in the absence of an insanity defense, irrelevant to the issue of guilt." *Id.* at 717, 324 S.E.2d at 688.

Also, during the guilt phase, the trial court sustained the prosecutor's objections to proffered testimony of Ronald Mabry, formerly a Child Protective Services Worker for the Warren County Department of Social Services. Mabry had "worked" with defendant and his family from 1976 to 1981 when investigating charges that defendant had been physically and sexually abused. At trial, defendant sought to present evidence through Mabry on the provocation issue. In addition, the trial court refused defendant's proffered instructions

on provocation and voluntary manslaughter upon the ground that the evidence failed to support such instructions.

On appeal, defendant contends that the trial court should have permitted him "to mount a manslaughter defense." We do not agree.

We need not decide whether the evidence proffered, and the instructions tendered relating to that issue, amounted to an effort to establish a diminished capacity defense or whether that evidence violated the *Stamper* principle. Rather, it is clear that defendant was not entitled, under the evidence, "to mount a manslaughter defense."

Defendant testified repeatedly during the penalty phase that for years he had planned to kill his uncle Floyd because he was "angry" at his family for the abuse he suffered at their hands as a child. He said, "they are the ones who made me the way I am." He testified that he contemplated "a number of different ways" to kill his uncle. He stated that as the result of his uncle's "proposition" made just before the crimes, he "had planned on killing Floyd." When asked by his attorney, "What were your intentions when you went to the house that night?" defendant responded, "I was going to kill Floyd."

Given the uncontradicted evidence about the deliberate, premeditated, wilful manner in which the uncle was killed, including defendant's own unequivocal testimony about his intentions, the uncle's homicide as a matter of law was committed with malice aforethought.

"Every malicious homicide is murder. Manslaughter, on the other hand, is the unlawful killing of another without malice. To reduce homicide from murder to voluntary manslaughter, the killing must have been done in the heat of passion and upon reasonable provocation." *Barrett* v. *Commonwealth*, 231 Va. 102, 105-06, 341 S.E.2d 190, 192 (1986) (citations omitted). Significantly, "[m]alice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." *Id.* at 106, 341 S.E.2d at 192. In other words, malice and passion cannot coexist. *Hannah* v. *Commonwealth*, 153 Va. 863, 870, 149 S.E. 419, 421 (1929).

Therefore, the trial court properly excluded the proffered testimony of Sultan and Mabry. Also, the tendered instructions on provocation and voluntary manslaughter were properly refused. *See Buchanan* v. *Commonwealth*, 238 Va. 389, 409, 384 S.E.2d 757,

769 (1989), *cert. denied,* 493 U.S. 1063 (1990) (instructions on lesser included offense properly refused when evidence showing murder to have been deliberate, premeditated, and wilful "clear and uncontroverted").

Next, defendant contends that the trial court erred in refusing his proffered instructions on second degree murder and intoxication. We reject this contention.

█ While a person who has become so intoxicated as to be unable to deliberate and premeditate cannot commit any class of murder that is defined as a wilful, deliberate, and premeditated killing, mere intoxication from drugs or alcohol will not suffice to negate premeditation. *Giarratano* v. *Commonwealth,* 220 Va. 1064, 1073, 266 S.E.2d 94, 99 (1980). Although defendant claimed to have consumed a substantial quantity of intoxicating beverages during the day of the crimes, the evidence was insufficient to show that he "was so intoxicated as to render him incapable of committing a wilful, deliberate and premeditated act designed to kill" the victims. *Hatcher* v. *Commonwealth,* 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978). *See Waye* v. *Commonwealth,* 219 Va. 683, 698, 251 S.E.2d 202, 211, *cert. denied,* 442 U.S. 924 (1979).

For example, shortly before the crimes were committed, defendant was observed in a local store by the manager. The defendant did not smell of alcohol nor did he appear intoxicated. The manager described him as "pleasant" and "very nice." In addition, the methodical manner in which the crimes were executed, as well as the efforts to clean the crime scene, negate any claim of severe intoxication.

Next, defendant contends that even if Sultan's testimony would not have been admissible at the guilt phase, it was admissible at the penalty phase. The defendant apparently believes, erroneously, that the trial court prohibited Sultan from testifying during the penalty phase. Nonetheless, this issue was not the subject of an assignment of error. Therefore, it has been procedurally defaulted, and we will not consider it. Rule 5:25; *Cheng* v. *Commonwealth,* 240 Va. 26, 41, 393 S.E.2d 599, 607 (1990).

Next, defendant contends that the prosecutor committed misconduct "in intimidating" Sultan by threatening her "indirectly" with potential prosecution for misdemeanors in connection with her trial testimony. The issue arises in the following manner.

As the penalty phase began on the fifth day of trial, the prosecutor filed a motion to exclude Sultan's testimony. In the motion, the

prosecutor asserted that Sultan was not licensed to practice clinical psychology in Virginia, and that her examination of defendant in Virginia, and subsequent testimony, amounted to a criminal violation of certain Virginia licensing statutes. The trial court overruled that motion, deciding that Sultan could properly testify during the penalty phase. But defense counsel, not the prosecutor, informed Sultan of the motion and Sultan, after consulting independent counsel, elected not to testify. She stated to the trial court that the allegations about her conduct placed her "at risk," both ethically and legally.

Defendant argues that the prosecutor's alleged misconduct in threatening Sultan with criminal prosecution effectively abridged his constitutional rights to present evidence in his favor during the penalty phase. This contention is meritless.

A fundamental element of due process is a defendant's right to present his own witnesses to establish a defense. *Webb* v. *Texas*, 409 U.S. 95, 98 (1972). But a prosecutor is permitted under our adversary system to conduct the prosecution with earnestness and vigor. *United States* v. *Young*, 470 U.S. 1, 7 (1985). A prosecutor may not exert such duress on a defense witness' mind "as to preclude him from making a free and voluntary choice whether or not to testify." *Webb*, 409 U.S. at 98.

Here, the prosecutor merely employed an acceptable trial tactic to test whether the witness legally and properly should be permitted to testify. There is not the slightest hint in this record that the prosecutor intended to exert such duress on Sultan's mind as to preclude her from making a free and voluntary choice whether or not to testify, or to drive her from the witness stand. *See United States* v. *Touw*, 769 F.2d 571 (9th Cir. 1985). Indeed, the trial court denied the prosecutor's motion and ruled that Sultan properly could testify during the penalty phase. The defendant claims surprise because the motion to exclude was made at a late stage in the trial. Yet, defendant did not move for a continuance of the penalty phase of the bifurcated proceeding and chose to proceed. The sole reason Sultan did not testify was because she voluntarily withdrew herself as a witness, not because of any improper conduct by the prosecutor.

Next, defendant argues the trial court erred in denying his request to instruct the jury that if defendant were given life sentences, he would not be eligible for parole for 30 years. As defendant recognizes, we consistently have held that a jury may not

be informed by evidence or instructions of a defendant's parole eligibility in the event of a life sentence. *Watkins* v. *Commonwealth*, 238 Va. 341, 351, 385 S.E.2d 50, 56 (1989), *cert. denied*, 494 U.S. 1074 (1990); *Hinton* v. *Commonwealth*, 219 Va. 492, 495, 247 S.E.2d 704, 706 (1978). "During the penalty phase it was the jury's duty to assess the penalty, irrespective of considerations of parole." *Poyner* v. *Commonwealth*, 229 Va. 401, 418-19, 329 S.E.2d 815, 828, *cert. denied*, 474 U.S. 865 and 474 U.S. 888 (1985). We decline defendant's invitation to change our position on this issue.

Further on the subject of parole, the defendant, during a post-trial hearing on his motion to set aside the verdict, contended that, during deliberations, the jury improperly discussed that defendant may be eligible for parole in ten years if given life sentences. To support that argument, defendant relied upon a post-verdict news account of an interview with the jury foreman. According to the press report, the foreman purportedly stated that the jurors "asked themselves" the following question: "A lot of us have children and grandchildren. Okay, in ten years, do you want your child to run into [the defendant] on the street?" The trial court refused to recall the jurors for questioning or to set the verdict aside on that ground, and defendant assigns error to the court's action.

■■■■ We hold that the trial court did not err. "Virginia has been more careful than most states to protect the inviolability and secrecy of jurors' deliberations. We have adhered strictly to the general rule that the testimony of jurors should not be received to impeach their verdict, especially on the ground of their own misconduct." *Caterpillar Tractor Co.* v. *Hulvey*, 233 Va. 77, 82, 353 S.E.2d 747, 750 (1987). "Generally, we have limited findings of prejudicial juror misconduct to activities of jurors that occur outside the jury room." *Id.* at 83, 353 S.E.2d at 751. For example, the exception has been applied to expressions of opinion made by a juror to third persons during trial proceedings. *Haddad* v. *Commonwealth*, 229 Va. 325, 329 S.E.2d 17 (1985). In the present case, however, any alleged misconduct, if it occurred, was clearly within the confines of the jury room. Thus, a post-trial investigation into the allegations was unwarranted.

■■■ Next, defendant argues that the trial court erred during the penalty phase in giving an instruction offered by the Commonwealth and refusing three instructions he tendered. In support of that argument, defendant merely refers us to 15 pages of transcript that record the argument counsel made in the trial court on this issue.

This is insufficient and amounts to procedural default. "An appellant who asserts that a trial court's ruling was erroneous has an obligation to state clearly to the appellate court the grounds for that assertion. A cross-reference to arguments made at trial is insufficient." *Spencer* v. *Commonwealth*, 240 Va. 78, 99, 393 S.E.2d 609, 622, *cert. denied*, 498 U.S. 908 (1990).

Finally, defendant contends the death sentences were imposed as a result of passion and prejudice, and are disproportionate to the culpability of the defendant and to the nature of the crimes. We disagree.

As we have said, the jury fixed defendant's sentence at death on the capital murder convictions upon findings of "vileness" and "future dangerousness." Defendant points to no basis for concluding that these determinations were made arbitrarily. On the contrary, the record fully supports the conclusion that the sentences were appropriate under the circumstances.

On the question of "vileness," the murders demonstrated depravity of mind, aggravated battery, and physical and psychological torture of the victims. Jenkins was lying in bed listening to a radio when he was shot in the face and left alive "gagging" for a period of time until defendant returned to brutally complete the killing. After shooting the uncle, defendant proceeded to stab him with such force that his internal organs protruded from his body. Brinklow was sitting passively on a sofa when, after the two argued, defendant shot him in the face with a rifle. While bleeding from the head, Brinklow was forced to walk outside to look for a hand gun, to return inside, and eventually was shot at point-blank range while he was lying down. This was accomplished after he begged defendant to spare his life.

On the question of "future dangerousness," the record shows that defendant had been tried as an adult in 1985 and convicted of two felonies when he was 16 years of age. He was released from prison after five years and, within about a month, committed the brutal murders we have just described, as well as the associated crimes. The record also shows that, while awaiting trial, defendant threatened jailors, fashioned knives, struck another inmate with pliers, attempted to escape, and threatened to kill two persons.

On the question of disproportionality and excessiveness, we determine whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant. Code § 17-

110.1(C)(2); *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980). "In determining whether a sentence of death is excessive or disproportionate, we consider the records of all capital murder cases previously reviewed by this Court in which the death sentence was based upon both predicates, including cases where life imprisonment was imposed." *Satcher*, 244 Va. at 261, 421 S.E.2d at 845. Defendant asserts no substantive reason why the sentences are disproportionate; he merely says that we should "focus on the mitigating evidence and . . . find that the sentencing of death is disproportionate in light of the tragic upbringing of Arthur Jenkins."

 Previous cases in which the death sentence was imposed upon both the "vileness" and "future dangerousness" predicates are documented in *Satcher*. *Id.*, 421 S.E.2d at 846. From a consideration of these previous cases, we conclude that the death sentences in this case are not excessive or disproportionate to the punishment generally imposed by juries in the Commonwealth for similar conduct.

Consequently, we hold the trial court committed no error, and we have independently determined from a review of the entire record that the sentences of death were properly assessed. Thus the judgment of the trial court will be affirmed.

Record No. 920566 - *Affirmed.*
Record No. 920567 - *Affirmed.*