UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ARTHUR RAY JENKINS, III,
Petitioner-Appellant,

v.

No. 98-13

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-96-934-3)

Argued: October 29, 1998

Decided: January 12, 1999

Before ERVIN and NIEMEYER, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed in part and dismissed in part by unpublished opinion. Judge
Niemeyer wrote the opinion, in which Judge Ervin and Senior Judge
Butzner joined.

_____

**COUNSEL**

**ARGUED:** Charles Frederick Witthoefft, HIRSCHLER,
FLEISCHER, WEINBERG, COX & ALLEN, Richmond, Virginia,
for Appellant. Robert Quentin Harris, Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for

Appellee. **ON BRIEF:** Ian J. Wilson, HIRSCHLER, FLEISCHER, WEINBERG, COX & ALLEN, Richmond, Virginia, for Appellant. Mark L. Earley, Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

NIEMEYER, Circuit Judge:

Arthur Ray Jenkins, III, was convicted by a jury in Virginia state court of murdering Floyd Jenkins, his uncle, and Lee Brinklow. He was given two death sentences. The Virginia Supreme Court affirmed the convictions and death sentences. Jenkins v. Commonwealth, 423 S.E.2d 360 (Va. 1992). After Jenkins exhausted his available state remedies, he petitioned the United States District Court for the Eastern District of Virginia for habeas corpus relief under 28 U.S.C. § 2254. The district court dismissed the petition and this appeal followed. On appeal, Jenkins contends:

   (1) that the Commonwealth of Virginia denied Jenkins due process by failing to disclose significant exculpatory evidence relating to a jailer who sexually abused Jenkins and then testified against him;

   (2) that he was denied due process by the ineffectiveness of his trial counsel in failing to obtain and make available to his expert witness his complete Department of Corrections medical records about his mental health;

   (3) that he was denied a competent mental health expert and the right to an adequate mental health evaluation at trial, in violation of the holding of Ake v. Oklahoma , 470 U.S. 68 (1985); and

2

(4) that the admission at trial of two videotaped confessions violated his Fifth Amendment and Fourteenth Amendment due process rights.

The district court granted Jenkins a certificate of appealability with respect to the first two claims and denied the certificate with respect to the second two. For the reasons that follow, we affirm the district court's ruling on the first two claims and deny Jenkins' motion for a certificate of appealability on the second two, dismissing the appeal as to them.

I

The facts, as related by the Virginia Supreme Court, are as follows:

> There is virtually no conflict in the facts relating to the commission of these crimes. The defendant has not denied committing the homicides. Indeed, he admitted the killings to almost everyone with whom he talked subsequent to the day in question.
>
> * * *
>
> During October 12, the day the crimes were committed, the defendant, age 21, had been drinking whiskey and beer with his younger brother, Kevin Frame. In the early evening, defendant engaged in a fight with another man outside a local restaurant. The defendant's mother and grandmother drove the defendant and Frame away from the restaurant and to the vicinity of the home where defendant was residing on Route 617 in Warren County. The defendant had lived there for about one month following his release from prison on September 6, 1990. The home was owned by Elizabeth Morris, defendant's aunt. Brinklow, age 69, and the uncle, Floyd Jenkins, age 72, also lived in the house.
>
> Near 10:00 p.m., defendant and Frame entered the home through the front door. Brinklow was sitting on a couch in the living room. Brinklow told Frame to leave the house

3

because the aunt, who was not present, did not allow Frame inside. An argument ensued between Brinklow and the defendant. The defendant went to Brinklow's bedroom, obtained a .22 rifle capable of firing only one shot at a time, and returned to the living room. The defendant loaded the rifle and shot Brinklow once in the face; the shot did not kill him.

The defendant walked to the "back bedroom" where the uncle was lying in bed listening to a radio. After the defendant reloaded the rifle, he "stuck it" to the uncle's head. The uncle "grabbed it" and defendant said, "Let go before I kill you." The uncle "let go" and the defendant"stuck the gun to his head" and shot him. The uncle began "gagging," and defendant returned to the living room.

The defendant asked Brinklow the location of Brinklow's hand gun, and Brinklow responded that the weapon was in Brinklow's pick-up truck parked outside the house. Ordering Frame to "watch" the uncle, defendant"took" Brinklow to the truck, where the hand gun could not be located.

Defendant escorted Brinklow back into the house where defendant went to the kitchen and procured two "butcher knives." Defendant gave one to Frame and retained the other.

Defendant returned to the uncle's bedroom where he was still "gagging." By this time, Brinklow had been brought into the same bedroom where he laid on the floor. Defendant shot the uncle again in the head and "went berserk." He began stabbing the uncle with the knife until his"guts came out."

As defendant was picking up the "guts" and throwing them onto the uncle's body, Frame said, "Shoot him," referring to Brinklow. Brinklow pleaded with defendant not to kill him, stating that he "loved" defendant. Defendant "stuck" the rifle to Brinklow's head and "pulled the trigger."

4

The defendant and Frame carried the victims' bodies out the front door of the house and laid them in the bed of Brinklow's truck. The defendant and Frame returned to the house where they broke into the aunt's locked bedroom. The aunt had stored sums of money in various items in her bedroom; these items, with the money, were loaded into the truck. The evidence also showed that, at some point, defendant and Frame took the victims' wallets as well as other personal items.

Defendant drove the truck away from the house, intending to drive "to the police station." Frame persuaded defendant to turn in a different direction as they left the premises. A short distance from the residence, defendant lost control of the truck, which left the road and came to rest in a creek.

Defendant and Frame walked back to the home and attempted to clean the rooms, which were spattered with blood and contained body parts. The pair then left the premises, and defendant fled to the southwestern part of the State.

The aunt returned to her home about 1:50 a.m. on October 13 to find it in disarray and her funds missing. A short time later, the truck containing the victims' bodies was found by the police. Defendant was arrested about 11:30 p.m. on that day near Abingdon.

Autopsies of the victims' bodies showed that Brinklow sustained four gunshot wounds to the head, two of which were fatal. The uncle sustained three gunshot wounds to the head, two being fatal. He also sustained seven stab wounds to the abdomen, which injured vital organs and which penetrated the body up to a depth of eight inches.

Jenkins v. Commonwealth, 423 S.E.2d at 363-64.

II

Jenkins contends first that he was denied due process based on the sexually abusive conduct of the head jailer at the Washington County

5

(Virginia) Jail, Robert A. Clendenen, which occurred during Jenkins' incarceration for previous crimes. Jenkins contends that Clendenen used his position as head jailer to obtain sexual favors from prisoners, including Jenkins, by granting them favors and providing them with illegal drugs. Jenkins asserts that this sexual abuse affected his state of mind and contributed to the murders.

Independent of any complaint by Jenkins, Clendenen was investigated by the FBI and indicted by a federal grand jury for "intimidating, coercing, and cajoling" inmates at Washington County Jail to engage in homosexual relations with Clendenen. The United States dropped the sexual abuse charges against Clendenen in exchange for a guilty plea to embezzlement. In any event, neither the indictment nor the FBI reports name Jenkins as a victim of Clendenen's alleged crimes.

Jenkins contends that the Commonwealth knew of Clendenen's improper sexual conduct against Jenkins and failed to disclose it to him, thereby denying him that evidence at trial. Jenkins also argues that Clendenen lied about the relationship during the sentencing phase of his trial, and the Commonwealth made use of the lies.

The Commonwealth asserts that Jenkins made this argument for the first time in his federal habeas petition and that the claims are therefore procedurally defaulted. In addition, the Commonwealth points out that the district court appointed an expert on Jenkins' behalf to investigate the Virginia Department of Corrections, the Washington County Jail, the Washington County and Warren County Commonwealth Attorneys' Offices, the Attorney General, the State Police, the FBI, and the federal grand jury. It maintains that this investigation revealed no evidence that Clendenen had any improper relationship with Jenkins. The Commonwealth also notes that the FBI investigation corroborates this.

Because Jenkins did not make this argument in any state court, it is procedurally defaulted, and Jenkins is barred from raising it for the first time during a habeas proceeding in federal court unless he can show "cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure." Keeney v. Tamayo-Reyes, 504 U.S. 1, 11 (1992). "Cause may be established for

6

a procedural default where an objective impediment made compliance with the procedural rule impossible." Clanton v. Muncy, 845 F.2d 1238, 1241 (4th Cir. 1988) (citing Murray v. Carrier, 477 U.S. 478 (1986)). But even where there is such an objective impediment, the petitioner may not rely on it if the information sought was "reasonably available" to him. Barnes v. Thompson , 58 F.3d 971, 976 (4th Cir. 1995). Jenkins' default will also be excused "if he can show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing." Keeney, 504 U.S. at 12.

The information regarding Clendenen's alleged abuse of Jenkins was known to Jenkins, and therefore it was obviously readily available to him. Jenkins nevertheless argues that he was incapable of bringing the allegations to the attention of his state trial counsel, state appellate counsel, and state habeas counsel because he has a mental illness that prevents him from sharing such personal traumas. This argument, however, is not consistent with Jenkins' affidavit filed in this case in which he gave his reasons for not telling anyone about Clendenen's abuse. In the affidavit, Jenkins states:

> I did not advise my trial attorneys for my state habeas counsel about what happened with Clendenen during my time at the Washington County Jail for a number of reasons. First, I did not know it was important or had anything to do with my case and I was not asked about it. I did not tell my current attorneys about this until they asked me. Second, as a prisoner, it is dangerous to talk about a guard, or to discuss homosexuality. Finally, . . . I thought that [Clendenen] was my friend.

None of these reasons appears to be related to any mental illness. Moreover, even if Jenkins had not made this admission, there is no evidence in the record to suggest that he was mentally incapable of revealing his personal sexual history. He discussed other homosexual encounters both at trial and in his conversations with Dr. Gary L. Hawk, an expert psychologist who testified on Jenkins' behalf at trial. For example, he related at trial that he was raped by his uncle, Floyd Jenkins, when he was six, that he had been raped by another uncle, and that he had homosexual liaisons with other students at state institutions. Even if mental illness were a ground excusing procedural

7

default, a matter that we do not here decide, Jenkins has not established any evidence that mental illness was a cause for his default.

We are also satisfied that no fundamental miscarriage of justice will result from the failure to hold a federal evidentiary hearing on this point. Even with such evidence as Jenkins claims should have been presented on his behalf, the reliability of the state trial remains. The undisputed facts establish that Jenkins committed two brutal murders.

To the extent that Jenkins' claim regarding the Commonwealth's suppression of Clendenen's sexually abusive conduct rests on Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"), his argument would fail for the same reasons that his claim is defaulted. "[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine." United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990). There is no evidence in this record that any officer or agent of the Commonwealth, other than Clendenen, knew anything about the relationship between Jenkins and Clendenen. Even if there were such evidence, Jenkins would have no Brady claim because he had full knowledge of the information and, indeed, produced it in this case when asked by his attorney.

III

Jenkins next claims that he received ineffective assistance of counsel because his counsel did not obtain 800 pages of Virginia Department of Corrections' medical records relating to him.

Although Jenkins' counsel made an effort to obtain all Jenkins' medical records so that Dr. Gary L. Hawk, the expert psychologist retained by counsel, could perform a mental evaluation of Jenkins, counsel did not obtain a batch of Department of Corrections' records before trial. As a consequence, Dr. Hawk filed his report about Jenkins with the notation that he was still awaiting the Department of

8

Corrections' records. Explaining the significance of the records to the Virginia trial court, Jenkins' counsel stated:

> Dr. Hawk said that while he feels relatively certain that the eventual conclusions would not change based upon the receipt of DOC records, because he thinks he knows what DOC will end up saying, he does not feel comfortable with submitting a report to which he would later be held that involves a five-year hunk of records that he doesn't have.

Dr. Hawk stated that he felt the information was important because Jenkins had been incarcerated for much of the time between ages 12 and 21, the age when he committed the double murders in this case.

Since the trial in this case, Dr. Hawk has reviewed the Department of Corrections' records and, in a statement filed in support of Jenkins' petition with the district court, said:

> The DOC Records would have been highly relevant to my evaluation of Mr. Jenkins. The 1991 evaluation of Mr. Jenkins was incomplete because of the lack of the DOC Records and the lack of a consulting psychiatrist to address the matters reflected in the records that were not provided to me by trial counsel.

In response to Jenkins' claim, the Commonwealth notes that the district court found that the efforts of Jenkins' counsel were reasonable and that Jenkins was not prejudiced by not having the 800 pages. The Commonwealth also argues that Jenkins misrepresents the nature of the Department of Corrections' records. While it acknowledges that the 800 pages include "some psychological or psychiatric evaluations or reports," it asserts that most of the records relate to "Jenkins' abysmal prison record" over the years. The Commonwealth points out further that Dr. Hawk recognized all of the facts contained in the records and learned little new from them. The jury at Jenkins' trial was advised at length about the circumstances of Jenkins' upbringing, his history of neglect, physical abuse, sexual abuse, and institutionalizations. Finally, the government points out that Jenkins had the benefit of extremely experienced counsel. One of them has been described by this court as "one of the experts in the field of capital cases, [who]

9

had handled more death penalty litigation than any other private attorney in Virginia, and [who] was one of the most experienced criminal lawyers in Virginia." Turner v. Williams, 35 F.3d 872, 900 n.24 (4th Cir. 1994) (internal quotation marks and citations omitted).

In order to demonstrate ineffective assistance of counsel, Jenkins must show both (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984). To demonstrate counsel's deficiency, Jenkins must show that counsel's representation of him "fell below an objective standard of reasonableness," making "errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. And to demonstrate the prejudice prong, Jenkins must show that "counsel's errors were so serious as to deprive[Jenkins] of a fair trial, a trial whose result is reliable." Id. at 687. Stated otherwise, Jenkins must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In this case, we conclude that Jenkins has satisfied neither prong.

The failure of Jenkins' counsel to acquire the Department of Corrections records must be looked at in the context of counsel's overall investigation of Jenkins' competency and state of mind. To investigate those matters, counsel retained Dr. Hawk, who is an Associate Professor of Behavior Medicine and Psychiatry at the University of Virginia, a clinical psychologist, and director of psychology at the Institute of Law and Psychiatry and Public Policy at the University of Virginia. Dr. Hawk received what he described as a"tremendous volume" of records. He also had the assistance of Dr. Janet Warren, who holds a doctorate degree in social work. Dr. Warren, like Dr. Hawk, is well qualified, having conducted forensic evaluations in 45 capital cases. Dr. Warren testified that she conducted an extensive review of Jenkins' records including a review of "all of the psychiatric records."

While Dr. Hawk informed Jenkins' counsel before trial that Hawk would have preferred to have the Department of Corrections records, he noted that the records were unlikely to change his conclusions. Given this information, counsel could reasonably have made the judgment not to use their limited time tracking down Department of Cor-

10

rections' records when other matters for the defense had to be completed. Even looking in hindsight, we cannot conclude that counsel's time would have been better spent obtaining the records than preparing for trial in other ways. Accordingly, we cannot conclude that Jenkins' counsel were ineffective or deficient, particularly when we apply the "heavy measure of deference to counsel's judgments" required in assessing his performance. See Strickland, 466 U.S. at 691; Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995).

Jenkins has also failed to demonstrate that the alleged deficiency of his counsel's performance resulted in prejudice to his defense. The district court correctly observed:

> Dr. Hawk's expert opinion was informed and had a well documented factual basis that has not been substantially altered by the missing records. The missing records do not provide substantially different information from that which Dr. Hawk possessed at the time of his testimony. Indeed, Dr. Hawk himself makes no statement in his affidavit attached to petitioner's habeas corpus petition that the additional records support an insanity defense. . . . Furthermore, much of the information provided in the records supports the Commonwealth's evidence of future dangerousness. The reports make repeated references to Jenkins' aggressiveness demonstrated in assaults on both peers and staff, inappropriate sexual behavior, escapes and escape attempts.

Jenkins argues that the Department of Corrections records would have alerted his defense team to the need to retain a psychiatrist. But he provides no indication that the retention of a psychiatrist would have altered the outcome of Jenkins' trial. See Strickland, 466 U.S. at 694 (holding that to demonstrate prejudice, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

IV

Jenkins next claims that he was denied a competent mental examination in violation of Ake v. Oklahoma, 470 U.S. 68, 83 (1985) (holding that when sanity is an issue, the state must "assure the defendant

11

access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense"), because he was assisted by a psychologist rather than a psychiatrist. After his counsel were appointed to represent Jenkins, they retained Dr. Hawk, a clinical psychologist, to perform a mental evaluation of Jenkins. When the Virginia trial judge asked counsel whether Jenkins should be examined by a psychiatrist, counsel indicated that a psychologist's examination would be sufficient and assured the court that there was a psychiatrist on staff with Dr. Hawk at the Blue Ridge Hospital at the Institute of Law and Psychiatry. The court did not deny Jenkins a psychiatrist. On the contrary, Jenkins, through his counsel, decided that a psychologist would be a more effective expert. Having received the assistance of the expert of his choice, Jenkins cannot now claim that he was deprived access to an appropriate expert on his mental state.

To the extent that Jenkins challenges the opinion reached by Dr. Hawk, Jenkins has no Ake claim. "[T]he decision in Ake reflects primarily a concern with ensuring the defendant access to a psychiatrist or psychologist, not with guaranteeing a particular substantive result." Wilson v. Greene, 155 F.3d 396, 401 (4th Cir.), cert. denied, 119 S. Ct. 536 (1998) (emphasis in original). Ake does not entitle a defendant to the effective assistance of an expert witness selected or assigned to him. Id. Because Jenkins had access to a competent mental health expert, his Ake rights were not violated.

V

Finally, Jenkins claims that the trial court denied his Fifth Amendment rights by admitting at trial two videotaped confessions. The first of these confessions was given by Jenkins on October 15, 1990, and the second, the next day, on October 16, 1990.

Before Jenkins gave the first videotaped confession, a Commonwealth investigator informed him that he could have an attorney present. When Jenkins asked if having an attorney would be helpful, the investigator responded, "Well, that depends on whether or not you want to tell the truth." Jenkins then asked,"That ain't going to hurt me in the courtroom?" The investigator responded,"No. Uh, I told you evidence is going to prove what is true. And it always helps a fel-

low to tell the truth. It shows that you're cooperative." Before giving the second videotaped confession on the next day, Jenkins was given a more traditional Miranda warning and Jenkins signed a paper waiving his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 444 (1966) (holding that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed").

Jenkins contends that the Commonwealth investigator improperly advised Jenkins with respect to the first confession that he did not need a lawyer if he was going to tell the truth. He maintains that a confession following such a warning is involuntary and therefore in violation of Jenkins' constitutional rights. Jenkins argues furthermore that the confession the next day was tainted as the product of the first improper confession. Jenkins argues for the first time during federal habeas proceeding that the confessions had a substantial and injurious impact on the sentencing phase because in the confessions Jenkins described killing the two victims in graphic detail with little sign of remorse.

While it is questionable whether the admission of the October 15 confession was accompanied by proper Miranda warnings, the second confession, given 24 hours later, was accompanied by full Miranda warnings which Jenkins said he understood, and this is reflected in his signed waiver. As the Virginia Supreme Court observed in this case, "`a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.'" Jenkins, 423 S.E.2d at 367 (quoting Oregon v. Elstead, 470 U.S. 298, 318 (1985)).

Even if both confessions were erroneously admitted, Jenkins is not entitled to federal habeas relief. Constitutional error does not require relief unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Jenkins can show no such prejudice. As the Virginia Supreme Court observed, "[Jenkins] admitted the killings to almost everyone with whom he talked subsequent to the day in ques-

13

tion." <u>Jenkins</u>, 423 S.E.2d at 363. He had confessed to three friends, to other jail inmates, to those transporting him from the Washington County Jail, and finally <u>during his testimony at trial</u>. <u>Cf</u>. <u>Cooper v. Taylor</u>, 103 F.3d 366, 370 (4th Cir. 1996) (en banc) (holding that the admission of a third challenged confession was harmless). Although Jenkins claims that the videotaped confessions prejudiced the penalty phase of his trial, he did not make this argument on direct appeal or in state habeas proceedings. Having defaulted these claims, he may not now present them for the first time in a federal habeas corpus case. <u>See Gray v. Netherland</u>, 518 U.S. 152, 161-62 (1996).

VI

Following dismissal of his federal habeas corpus petition by the district court, Jenkins moved for a certificate of appealability. The district court granted the motion with respect to the first two points discussed in this opinion and denied it with respect to the second two. Accordingly, we affirm the district court on the first two points, and we conclude, with respect to the second two, that Jenkins has failed to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Therefore we deny his motion for certificate of appealability and dismiss the appeal with respect to them.

<u>AFFIRMED IN PART AND DISMISSED IN PART</u>

14