COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Petty, Chafin and Senior Judge Annunziata
Argued at Alexandria, Virginia


KENSTON KANGSON YI

v.        Record No. 2487-11-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE WILLIAM G. PETTY
JANUARY 29, 2013


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David S. Schell, Judge

Patrick M. Blanch (Elders, Zinicola & Blanch, PLLC, on briefs), for
appellant.

Eugene Murphy, Senior Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Kenston Kangson Yi was convicted in a jury trial of two counts of first-degree murder.

On appeal, Yi assigns error to four rulings of the trial court:  (1) the trial court erred by denying

his proposed jury instructions on voluntary manslaughter, the definition of malice, and the order

of deliberations of the jury regarding his insanity defense; (2) the trial court erred by denying his

motion to suppress the evidence discovered by police officers upon entering his home without a

warrant; (3) the trial court erred in finding that he waived his Miranda rights and gave a

voluntary statement to the police; and (4) the trial court erred in excluding alleged excited

utterances.  For the reasons expressed below, we disagree with Yi's arguments.  Therefore, we

affirm his convictions.

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I.

Because the parties are fully conversant with the record in this case and this memorandum opinion carries no precedential value, we recite below only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal. "On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)).

II.

A.  Proposed Jury Instructions

Yi presents three assignments of error concerning proposed jury instructions:  (1) the trial court erred in refusing his proposed voluntary manslaughter jury instruction; (2) the trial court erred in refusing his proposed jury instruction defining malice; and (3) the trial court erred in refusing his proposed jury instruction which instructed the jury to consider the insanity defense only after first making a finding of guilty on some degree of homicide.  For the reasons stated below, we hold that the trial court did not err in refusing these instructions.

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (quoting Swisher v. Swisher, 223 Va. 499, 503, 290 S.E.2d 856, 858 (1982)).  On appeal, we review the trial court's "broad discretion in giving or denying instructions requested" for an abuse of discretion.  Gaines v. Commonwealth, 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) (en banc).

1. <u>Voluntary Manslaughter</u>

Yi argues that the trial court erred in refusing his proposed voluntary manslaughter jury instruction. Specifically, Yi argues that there was evidence that the killing of his wife and child was not malicious and, thus, the trial court should have included voluntary manslaughter as a lesser-included offense of murder. We disagree.

When the proposed jury instruction touches upon lesser-included offenses, "[i]f the evidence is sufficient to support 'a conviction of the crime charged, and there is no independent evidence warranting a conviction [of the lesser-included offense], an instruction on the lesser-included offense need not be given.'" <u>Commonwealth v. Vaughn</u>, 263 Va. 31, 36, 557 S.E.2d 220, 222-23 (2002) (second alteration in original) (quoting <u>Guss v. Commonwealth</u>, 217 Va. 13, 14, 225 S.E.2d 196, 197 (1976)).

> [W]e view the facts in the light most favorable to the defendant. However, an instruction is proper only if supported by more than a scintilla of evidence. If the instruction is not applicable to the facts and circumstances of the case, it should not be given. Thus, it is not error to refuse an instruction when there is no evidence to support it.

<u>Commonwealth v. Sands</u>, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001) (citations omitted).

"'Every malicious homicide is murder. Manslaughter, on the other hand, is the unlawful killing of another without malice. To reduce homicide from murder to voluntary manslaughter, the killing must have been done in the heat of passion and upon reasonable provocation.'" <u>Jenkins v. Commonwealth</u>, 244 Va. 445, 457, 423 S.E.2d 360, 368 (1992) (quoting <u>Barrett v. Commonwealth</u>, 231 Va. 102, 105-06, 341 S.E.2d 190, 192 (1986)).

The lodestar which distinguishes murder from manslaughter is malice; malice is a requisite element of murder, but it is not required for manslaughter. <u>Essex v. Commonwealth</u>, 228 Va. 273, 280, 322 S.E.2d 216, 219-20 (1984). This is because "[m]alice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of

malice." Barrett, 231 Va. at 106, 341 S.E.2d at 192. There are two types of malice: express and implied. "Express malice is evidenced when 'one person kills another with a sedate, deliberate mind, and formed design.' Implied malice exists when any purposeful, cruel act is committed by one individual against another without any, or without great provocation." Pugh v. Commonwealth, 223 Va. 663, 668, 292 S.E.2d 339, 341 (1982) (quoting M'Whirt's Case, 44 Va. (3 Gratt.) 594, 604 (1846)).

The overwhelming evidence in this case demonstrates that Yi committed a malicious killing. With a sedate, deliberate mind, and formed design, Yi walked to the lower floor of his apartment, convinced his daughter he was going to give her a massage, placed a ten-pound barbell to her neck, pressed down, and slowly and methodically suffocated his daughter to death as she futilely struggled for life. After checking his daughter for a pulse, and finding none, Yi picked up a larger barbell and stalked upstairs to where his wife slept. Yi knew that his wife, unlike his daughter, would likely struggle if he tried to merely suffocate her with the barbell. So, as his wife was lying asleep in bed, Yi pummeled her in the head with the barbell and then used it to suffocate her to death. Like he did with his daughter, Yi checked for a pulse from his wife before he was satisfied that his killing was finished.

There is simply no evidence warranting a conviction of voluntary manslaughter. In fact, Yi concedes the absence of heat of passion and adequate provocation. Yet, Yi still argues that a voluntary manslaughter instruction should have been given to the jury. In so arguing, Yi proposes a new kind of voluntary manslaughter. Yi's voluntary manslaughter proposal does not require that the killing be committed with heat of passion or adequate provocation. Yi supports his argument by pointing to his purpose in killing his wife and daughter: to spare them from the shame and hardship that his suicide would bring. Yi claims his subjective intention, or purpose, in killing his wife and child is sufficient to negate malice. There is no authority for the existence

of Yi's proposed voluntary manslaughter killing. Voluntary manslaughter requires heat of passion and reasonable provocation. Jenkins, 244 Va. at 457, 423 S.E.2d at 368. Yi did not present a scintilla of evidence supporting a finding of either heat of passion or reasonable provocation. Therefore, the trial court did not err in refusing Yi's proposed voluntary manslaughter jury instruction.

Furthermore, and notwithstanding the fact that the evidence did not warrant an instruction on voluntary manslaughter, any error in the trial court's ruling would have been harmless. "An error is harmless 'if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same.'" Turner v. Commonwealth, 23 Va. App. 270, 275, 476 S.E.2d 504, 507 (1996) (quoting Davies v. Commonwealth, 15 Va. App. 350, 353, 423 S.E.2d 839, 840 (1992)). Accordingly, if we are "able to determine that the trial court's error in failing to instruct the jury could not have affected the verdict, that error is harmless." Id. at 276, 476 S.E.2d at 507. We can make this determination "where it is evident from the verdict that the jury would have necessarily rejected the lesser-included offense on which it was not instructed." Id.

Here, the jury convicted Yi of first-degree murder.

> In convicting [Yi] of first degree murder, the jury rejected the lesser-included offense of second degree murder. In so doing, the jury found beyond a reasonable doubt that [Yi] acted not only maliciously, but also willfully, deliberately, and premeditatedly. Homicide committed pursuant to a preconceived plan is not voluntary manslaughter; premeditation and reasonable provocation cannot co-exist. The verdict reached by the jury here compels the conclusion that it would never have reached a voluntary manslaughter verdict.

Id. at 277-78, 476 S.E.2d at 508.

In rejecting the lesser-included offense of second-degree murder, the jury "necessarily rejected the factual basis upon which it might have rendered a verdict on the lesser-included

- 5 -

offense of voluntary manslaughter." Id. at 278, 476 S.E.2d at 508.  As in Turner, "[t]he verdict reached by the jury here compels the conclusion that it would never have reached a voluntary manslaughter verdict." Id. at 277, 476 S.E.2d at 508.  Therefore, any error in the trial court's refusal to instruct the jury on voluntary manslaughter was harmless.

### 2. Malice

Yi next argues that the trial court erred in refusing his proposed jury instruction defining malice.  We disagree.

At trial, Yi proposed to expand upon the model jury instruction defining malice.  The model jury instruction stated:

> Malice is that state of mind which results in the intentional doing of a wrongful act to another without legal excuse or justification, at a time when the mind of the actor is under the control of reason. Malice may result from any unlawful or unjustifiable motive including anger, hatred, or revenge.  Malice may be inferred from any deliberate[,] willful[,] and cruel act against another, however sudden.

Yi's proposed expansion of the model jury instruction stated:

> Malice is not confined to ill will, but includes any action flowing from a wicked or corrupt motive, done with an evil mind or wrongful intention, where the act has been attended with such circumstances as to carry in it the plain indication of a heart deliberately bent on mischief.

The trial court held that Yi's proposed addition to the jury instruction did not fit the facts of the case, and it would have misled the jury.  Thus, we limit our review to whether the trial court abused its discretion in denying the proposed jury instruction for those reasons.  See Daniels v. Commonwealth, 275 Va. 460, 466, 657 S.E.2d 84, 87 (2008) ("Our review then is limited to whether the trial court abused its discretion in denying the proposed instruction for [the trial court's given] reasons.").

- 6 -

"'When granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle.'" Id. (quoting Stockton v. Commonwealth, 227 Va. 124, 145, 314 S.E.2d 371, 384 (1984)).

> Our previous decisions reflect that even if jury instructions contain accurate statements of law, a trial court does not abuse its discretion by refusing the instruction if it "is not applicable to the facts and circumstances of the case," Hatcher v. Commonwealth, 218 Va. 811, 813-14, 241 S.E.2d 756, 758 (1978), or if it "would have created confusion and would have been misleading." Hubbard v. Commonwealth, 243 Va. 1, 15, 413 S.E.2d 875, 883 (1992).

Juniper v. Commonwealth, 271 Va. 362, 431, 626 S.E.2d 383, 426 (2006).

Here, the jury was given a proper definition of malice, which was derived from the model jury instructions and accorded with the traditional definition of malice. The given jury instruction fully and fairly covered the definition of malice. The trial court, in reviewing Yi's proposed jury instruction, noted that the language was derived from a case that involved maliciously causing bodily injury and, therefore, the facts were not analogous to the facts of this case. Accordingly, the trial court held that the proposed jury instruction would mislead the jury, as it was not a proper statement of the law.

The trial court's decision accords with the long-recognized danger of using language from one case to tailor jury instructions in another case with distinguishable facts. See Shaikh v. Johnson, 276 Va. 537, 546, 666 S.E.2d 325, 329 (2008). "Unless clearly intended for use as a jury instruction, such language is inappropriate for that purpose." Id. The proposed jury instruction did not fit the facts and circumstances of the case and would have misled the jury. Therefore, the trial court did not abuse its discretion in refusing the proposed jury instruction.

3. <u>Insanity</u>

Yi next argues that the trial court erred in refusing his proposed jury instruction which instructed the jury to consider the insanity defense only after first making a finding of guilty on some degree of homicide. We disagree.

Yi's proposed jury instruction stated:

> The Court instructs the jury that the jury must first determine whether the Commonwealth has proved beyond a reasonable doubt any degree of homicide before considering whether the defendant was insane at the time of his defense, and is therefore not guilty by reason of insanity.
> If the jury finds that the Commonwealth has not proved beyond a reasonable doubt any degree of homicide, then the jury must find the defendant not guilty.
> If the jury finds that the Commonwealth has proved any degree of homicide beyond a reasonable doubt, only then should the jury consider whether the defendant was insane at the time of the offense.

The trial court refused the jury instruction because it invaded the province of the jury in determining its manner of deliberations. Moreover, the trial court found that the jury was properly instructed on the application of the defense of insanity.

As we stated above, "'When granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle.'" <u>Daniels</u>, 275 Va. at 466, 657 S.E.2d at 87 (quoting <u>Stockton</u>, 227 Va. at 145, 314 S.E.2d at 384). Further, "'The purpose of any jury instruction is to inform the jury of the law guiding their deliberations and verdict.'" <u>Morgan v. Commonwealth</u>, 50 Va. App. 120, 132, 646 S.E.2d 899, 905 (2007) (quoting <u>Keen v. Commonwealth</u>, 24 Va. App. 795, 807, 485 S.E.2d 659, 665 (1997)).

Here, the trial court fully and fairly instructed the jury both on the elements of the various crimes of homicide and on the application of the defense of insanity. Specifically, the trial court instructed the jury on Yi's burden of proof regarding his insanity defense. Instruction R advised

the jury that Yi was "presumed to have been sane *at the time of the commission of the crime*," and Yi had the burden to prove, by the greater weight of the evidence, "that he was insane *at the time when the crime was committed*." (Emphasis added). Both instructions imply a finding that a crime had been committed prior to absolving Yi for its commission. Further, Instruction S properly informed the jury as to the circumstances under which Yi should be acquitted on his insanity defense. Therefore, because the jury was fully and fairly instructed on Yi's insanity defense, we hold that the trial court did not abuse its discretion in refusing the proposed jury instruction.

Furthermore, there was simply no issue before the jury as to whether Yi had committed some degree of homicide. That fact is amply demonstrated by the closing arguments in the case. At the conclusion of his initial argument, the Commonwealth's attorney stated, "[T]he facts as you've heard and seen, and the law that you've heard and will be given when applied—the facts and law when applied—you will find that it meets the elements of first degree murder." Immediately following the Commonwealth's attorney's admonition, Yi's attorney responded,

> The Commonwealth is exactly right. The killing of Joy and Hyon Yi was a horrible, terrifying act. The victims were completely innocent and they are dead at the hands of my client, Kenston Yi. There is no way around that. There is no disagreement about those facts. The question is why and what do we do about it.

Even if the trial court had erred by failing to give the requested instruction, "[i]n this context, it is clear that [any] error in the [failure to give the] jury instruction was not material because it [could] not affect the outcome of the trial." Phoung v. Commonwealth, 15 Va. App. 457, 466, 424 S.E.2d 712, 717 (1992). Thus, any error in not giving the instruction would be considered harmless. See Lavinder v. Commonwealth, 12 Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991) (en banc) (finding where an error that is not important enough to affect the outcome of the trial is harmless error).

- 9 -

## B. Entry of the Home

Yi next argues that the trial court erred by denying his motion to suppress the evidence discovered by police officers upon entering his home without a warrant. We disagree.

> A defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that an appellate court must review *de novo* on appeal. In making such a determination, an appellate court must give deference to the factual findings of the circuit court and give due weight to the inferences drawn from those factual findings; however, the appellate court must determine independently whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment. The defendant has the burden to show that, considering the evidence in the light most favorable to the Commonwealth, the circuit court's denial of his suppression motion was reversible error.

Commonwealth v. Robertson, 275 Va. 559, 563-64, 659 S.E.2d 321, 324 (2008) (citations omitted).

"'The ultimate touchstone of the Fourth Amendment . . . is reasonableness.'" Michigan v. Fisher, 558 U.S. 45, ___, 130 S. Ct. 546, 548 (2009) (per curiam) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). Admittedly, the search of a home without a warrant is "presumptively unreasonable"; however, "that presumption can be overcome. For example, 'the exigencies of the situation [may] make the needs of law enforcement so compelling that the warrantless search is objectively reasonable.'" Id. (quoting Mincey v. Arizona, 437 U.S. 385, 393-94 (1978)).

> One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from injury.

Stuart, 547 U.S. at 403-04 (quoting Mincey, 437 U.S. at 392).

To justify an intrusion under the emergency exception,

> "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?"

Reynolds v. Commonwealth, 9 Va. App. 430, 437, 388 S.E.2d 659, 663-64 (1990) (quoting State v. Resler, 306 N.W.2d 918, 922 (Neb. 1981)).

Here, Fairfax County police received a call from "law enforcement on the base of Fort Belvior" informing them that a homicide had been committed at Yi's apartment. Officers Gleason and Williams were dispatched to Yi's apartment on the report that "there may be two bodies [at Yi's apartment] victimized." The officers arrived at Yi's apartment. Upon arriving at the apartment, the officers knocked on the door, rang the doorbell, and received no answer. The officers then had police dispatch call the apartment. No one answered the phone. After receiving no response from anyone in the apartment, Officer Williams decided to try and open the door. The door was not locked, and the officers stepped into the apartment. Immediately upon entering the apartment, the officers saw Yi's daughter lying on the ground. The officers checked for a pulse and found none. The officers then proceeded through the house to see if anyone else was in it. The officers found Yi's wife lying in the bed. After checking for a pulse, and finding none, the officers immediately exited the apartment, secured the scene, and notified dispatch. A search warrant was later obtained.

The officers acted reasonably and appropriately. A reasonable police officer, looking at the scene through the eyes of the officers, would have been justified under these circumstances to enter the apartment without a warrant. The officers received a call from dispatch about a homicide at the apartment. The officers responded to the call and arrived at the apartment with

the "hope" that the report of homicide victims in the apartment was incorrect.  It would be a manifest absurdity to require police officers to first seek a warrant before they respond to and secure a location where a homicide was reported.  Chief Justice Burger—then Judge Burger—perhaps said it best in <u>Wayne v. United States</u>, 318 F.2d 205, 212 (D.C. Cir. 1963):

> The need to protect or preserve life or avoid serious injury is justification for what would be otherwise [an] illegal [search] absent an exigency or emergency.  Fires or dead bodies are reported to police by cranks where no fires or dead bodies are to be found.  Acting in response to reports of "dead bodies," the police may find the "bodies" to be common drunks, diabetics in shock, or distressed cardiac patients.  But the business of policemen and firemen is to *act*, not to speculate or meditate on whether the report is correct.  People could well die in emergencies if police tried to act with calm deliberation associated with the judicial process.  Even the apparently dead often are saved by swift police response.

Here, the officers entered the apartment, in response to a report of a homicide, to protect or preserve life.  The exigent circumstances provided sufficient justification for the warrantless entry of the apartment.[1]  Therefore, the warrantless entry of Yi's apartment was reasonable, and the trial court did not err in denying Yi's motion to suppress the evidence.

### C. <u>Miranda</u> and Voluntariness

Yi next argues that the trial court erred in denying his motion to suppress statements that he made to police.  Specifically, Yi contends (1) that he did not knowingly, intelligently, and

---

[1] Further, we note, without holding, that the evidence recovered from the apartment—the two bodies—would likely have been eventually discovered.  "One of the exceptions to the exclusionary rule is the doctrine of inevitable discovery." <u>Commonwealth v. Jones</u>, 267 Va. 532, 535-36, 593 S.E.2d 204, 206 (2004).  This doctrine provides "that evidence obtained by unlawful means is nonetheless admissible 'if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" <u>Id.</u> (quoting <u>Nix v. Williams</u>, 467 U.S. 431, 444 (1984)).  It is reasonable to surmise that two dead bodies would have inevitably been discovered.  The murders occurred during the middle of the summer in Northern Virginia.  Assuredly, the odor of decaying bodies would have eventually permeated through the walls of the other apartments and led to the discovery of the bodies.

voluntarily waive his <u>Miranda</u> rights; and (2) that his confession was not voluntary. We disagree.

In reviewing a trial court's denial of a motion to suppress, the burden is on the appellant to show that the denial of his motion was reversible error. <u>McCain v. Commonwealth</u>, 261 Va. 483, 489-90, 545 S.E.2d 541, 545 (2001). At trial, the Commonwealth bears the burden of proving, by a preponderance of the evidence, "both that the accused knowingly, intelligently[,] and voluntarily waived his <u>Miranda</u> rights and that the confession itself was voluntary." <u>Rodriguez v. Commonwealth</u>, 40 Va. App. 144, 155, 578 S.E.2d 78, 83 (2003). On appeal, "the determination of whether the waiver was made knowingly and intelligently is a question of fact that will not be set aside on appeal unless plainly wrong." <u>Angel v. Commonwealth</u>, 281 Va. 248, 258, 704 S.E.2d 386, 392 (2011). Whether the confession was voluntary, however, is "ultimately a legal rather than factual question, but subsidiary factual decisions are entitled to a presumption of correctness." <u>Rodriguez</u>, 40 Va. App. at 155, 578 S.E.2d at 83. Nevertheless, if "the factual findings of the trial court are supported by the record, . . . we accord them substantial weight in making our determination whether [the] statement was voluntary." <u>Burket v. Commonwealth</u>, 248 Va. 596, 612, 450 S.E.2d 124, 133 (1994). Further, "[o]n appeal of the denial of a motion to suppress, we consider the evidence adduced at both the suppression hearing and at trial." <u>Dodd v. Commonwealth</u>, 50 Va. App. 301, 306, 649 S.E.2d 222, 224 (2007) (quoting <u>Ward v. Commonwealth</u>, 47 Va. App. 733, 742-43, 627 S.E.2d 520, 525 (2006)).

### 1. <u>Knowing and Intelligent Waiver</u>

No person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege is "the essential mainstay of our adversarial system." <u>Miranda v. Arizona</u>, 384 U.S. 436, 458 (1966). Notably, however, "[t]he sole concern of the Fifth Amendment, on which <u>Miranda</u> was based, is governmental coercion. Indeed, the Fifth

Amendment privilege is not concerned with 'moral and psychological pressures to confess emanating from sources other than official coercion.'" Colorado v. Connelly, 479 U.S. 157, 170 (1986) (quoting Oregon v. Elstad, 470 U.S. 298, 305 (1985)) (other citations omitted); see also Fare v. Michael C., 442 U.S. 707, 726-27 (1979) ("[The defendant was] not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit. . . . The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in Miranda."). "Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." Connelly, 479 U.S. at 170.

When the question to be answered is whether a defendant waived his Fifth Amendment privilege, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 474-75. A waiver is knowing and intelligent when it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Rodriguez, 40 Va. App. at 156, 578 S.E.2d at 83.

On appeal, Yi argues that he did not knowingly and intelligently waive his Miranda rights. Specifically, Yi argues that the audio recording of his interview with police, the toxological evidence, and other evidence presented at the suppression hearing were sufficient to prove that he did not understand his Miranda rights when he waived them.

The question of whether a defendant waived his Miranda rights "must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" North Carolina v. Butler, 441 U.S. 369, 374-75 (1979) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). In this case, the evidence presented at

both the suppression hearing and trial paints a vivid picture of the facts and circumstances surrounding Yi's condition at the time he waived his Miranda rights.

Yi presented himself to Dewitt Army Hospital at approximately 6:30 a.m. on June 14, 2010. Yi told the emergency personnel that he had taken thirteen Ambien pills the night before at approximately 11:00 p.m. Yi's vital signs were normal, and he was not in immediate medical distress. The triage nurse noted that Yi was alert, normal neurologically, and coherent. Dr. French, the attending emergency medicine physician at the hospital that morning, treated Yi. Dr. French said that Yi looked sleepy, but Yi was responsive to questioning, had his eyes open, and was obviously paying attention to questions.

At 9:50 a.m., Fairfax County Detective Needels arrived at the hospital in response to a call that an individual had been making claims about his family members. Detective Needels spoke with hospital staff and the hospital chaplain before speaking with Yi. Yi was taken into custody and transported to the Criminal Investigation Division office at Fort Belvior.[2] Yi was placed in an interview room. At 11:15 a.m., Detectives Needels and Wallace conducted an interview with Yi, of which an audio recording was made.

At the beginning of the interview, in order to determine Yi's condition, the detectives asked Yi about the medication that he was on and how many pills he had taken. The detectives then informed Yi of his Miranda rights. The detectives carefully reviewed each section of a Miranda waiver form with Yi to make sure that he understood his rights. Yi responded at least five times that he understood the individual warnings. Yi then signed the Miranda waiver form. After signing the waiver, Yi confessed to killing his wife and daughter.

---

[2] The trial court found that Yi was in custody, for the purposes of Miranda, at the time that the interrogation began. Neither Yi nor the Commonwealth challenged the trial court's finding on appeal.

Yi points to the toxological evidence in arguing that he did not make a knowing and intelligent waiver of his Miranda rights. At the suppression hearing, Yi's expert witness, Rory Doyle, testified that amnesia and blackouts are common side effects of Zolpidem[3] overdose. Doyle went on to say that Yi was under the effect of Zolpidem at the time of his interview and that Yi was "likely" not able to understand his rights. The Commonwealth also put on an expert witness, Dr. Carol O'Neil. Dr. O'Neil testified that at 6:50 a.m., the Zolpidem level in Yi's blood was .13 mg/L, an amount within the "therapeutic range" for the drug. Dr. O'Neil testified that Zolpidem is taken to treat insomnia, is fast acting, and causes users to become drowsy or sleepy within fifteen minutes of taking it. Nevertheless, Dr. O'Neil testified that the half-life of the drug is two to three hours and that therefore, four hours later, which was roughly the time that Yi's interview with the police began, the amount of Zolpidem in a person's system could be .03 mg/L to .06 mg/L. Dr. O'Neil testified that in this range, side effects may include confusion, disorientation, and delusions, but a very small percentage of users experienced such side effects, and she had not seen anything indicating it would cause users to tell lies.

The trial court, after reviewing the audio recording and listening to the testimony of the witnesses, found that Yi knowingly and intelligently waived his Miranda rights:

> [Yi] seemed to understand the Miranda rights when they were explained to him by the detectives. Yes, it took him some time. In fact[,] the detective took more time than actually was necessary because he appeared to be trying to make sure that [Yi] understood his rights.
> He went through the Miranda form section by section with [Yi], and [Yi] signed the form at the end. Based on that [I am] of the opinion that he did understand his rights.
> Also throughout the interview, looking at the interview as a whole[,] all two and a half to three hours, [Yi] appeared cogent, lucid, and he answered the questions of the detectives logically and when required thoroughly.

---

[3] The brand name for Zolpidem is Ambien.

Some of the answers were yes and no. Some were vivid descriptions by [Yi] as to what happened and why he did what he did or what happened next.

There were some sections that defense counsel has pointed out where there were inconsistencies, but on the whole [Yi] appeared to understand what was happening and to understand the questions.

There were no non-sensical answers to questions. There may have been some confusion or asking that a question be repeated, but there was not an answer that is totally unrelated to the question.

\* \* \* \* \* \* \*

Therefore, I find that [Yi] knowingly[,] intelligently[,] and voluntarily waived his <u>Miranda</u> rights in this case.

There is no evidence of police coercion. There is no evidence that Yi did not fully understand his <u>Miranda</u> rights. In fact, Yi signed a <u>Miranda</u> waiver. And, as the United States Supreme Court has held, when there is an express written waiver, such as the signing of a <u>Miranda</u> rights notice, there is "strong proof of the validity of waiver." <u>Butler</u>, 441 U.S. at 373. Based on the record before us, the trial court's finding that Yi's waiver was knowing, intelligent, and voluntary is supported by the evidence, and we cannot say that it was plainly wrong. Therefore, we hold that Yi's waiver was knowing, intelligent, and voluntary.

## 2. <u>Voluntariness of Confession</u>

Yi argues that his statements were not voluntarily given because his will was overborne. Specifically, Yi argues that his will was overborne because he was questioned by the detectives after he was transported in a hospital gown from the hospital to an interrogation room while under the influence of Zolpidem. In so arguing, Yi points out that he attempted suicide the night before the interrogation and that he was mentally ill at the time of the interrogation. We conclude that Yi's confession was voluntary.

A statement is voluntary if, when viewed "in light of the totality of the circumstances, . . . the statement is the product of an essentially free and unconstrained choice by its maker, or

whether the maker's will has been overborne and his capacity for self-determination critically impaired." Rodgers v. Commonwealth, 227 Va. 605, 609, 318 S.E.2d 298, 300 (1984).

In considering the totality of the circumstances, we must consider several factors, including "the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." Bottenfield v. Commonwealth, 25 Va. App. 316, 323, 487 S.E.2d 883, 886 (1997) (citations omitted). Nevertheless, evidence of "[c]oercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167. "The amount of coercion necessary to trigger the due process clause may be lower if the defendant's ability to withstand the coercion is reduced by intoxication, drugs, or pain, but some level of coercive police activity must occur before a statement or confession can be said to be involuntary." Commonwealth v. Peterson, 15 Va. App. 486, 488, 424 S.E.2d 722, 723 (1992).

Here, Yi fails to point to any conduct of the detectives that was coercive. Instead, as noted by the trial court, the detectives were amenable to any requests made by Yi during the interrogation. Specifically, when Yi asked for water, he was given water. When Yi asked to stand, he was allowed to stand. When Yi asked to go to the bathroom, he was allowed to go to the bathroom. The detectives did not raise their voices during the interrogation. The questions asked by the detectives were direct and to the point. The detectives did not threaten Yi. It was a normal, straight-forward interrogation. Admittedly, Yi was transferred to the police interrogation room in a hospital gown; however, this, standing alone, does not support a finding that Yi's will was overborne by the detectives.

Moreover, Yi was a retired Lieutenant Colonel in the United States Army and a graduate of the United States Military Academy at West Point. The evidence indicates that Yi understood

what was happening, and there is simply no evidence to support his contention that his will was overborne. Therefore, we conclude that the evidence supports the trial court's finding that Yi's will was not overborne, and his statements to the detectives were voluntarily given.

### D. Statement by Soonae Kim

Yi next argues that the trial court erred in holding that (1) a statement made by Yi's mother-in-law, Soonae Kim, to Yi's mother, Susan Yi, in response to the news that Yi killed his wife and daughter was not an excited utterance; and (2) the statement was too prejudicial to be admissible if not offered for the truth of the matter asserted. We disagree.

#### 1. Excited Utterance

"Decisions on the admissibility of evidence lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion." Mitchell v. Commonwealth, 25 Va. App. 81, 84, 486 S.E.2d 551, 552 (1997). "'There is no fixed rule by which the question whether [a] statement is admissible as an excited utterance can be decided. Resolution of the issue depends on the circumstances of each case and rests within the sound judicial discretion and judgment of the trial court.'" Hicks v. Commonwealth, 60 Va. App. 237, 245, 725 S.E.2d 748, 752 (2012) (quoting Clark v. Commonwealth, 235 Va. 287, 292, 367 S.E.2d 483, 486 (1988)).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Va. R. Evid. 2:801(c); see also Jenkins v. Commonwealth, 254 Va. 333, 338, 492 S.E.2d 131, 134 (1997). If a statement falls within the definition of hearsay, it is generally not admissible. Va. R. Evid. 2:802. The hearsay rule exists because hearsay evidence has "traditionally . . . been considered unreliable evidence." Myrick v. Commonwealth, 13 Va. App. 333, 337, 412 S.E.2d 176, 178 (1991). Nevertheless, the excited utterance exception to the hearsay rule exists because "the

stress or excitement produced by a startling event may suspend one's powers of deliberation and fabrication, thus ensuring the trustworthiness of declarations prompted by the startling event." Martin, 4 Va. App. at 441, 358 S.E.2d at 417.

Moreover,

"A statement comes within the excited utterance exception to the hearsay rule and is admissible to prove the truth of the matter stated, when the statement is spontaneous and impulsive, thus guaranteeing its reliability. . . . The statement must be prompted by a startling event and be made at such time and under such circumstances as to preclude the presumption that it was made as the result of deliberation. In addition, the declarant must have firsthand knowledge of the startling event."

Hicks, 60 Va. App. at 245, 725 S.E.2d at 753 (quoting Caison v. Commonwealth, 52 Va. App. 423, 431, 663 S.E.2d 553, 557 (2008)).

In this case, Susan Yi made a phone call to Soonae Kim and told her that Yi killed Kim's daughter. In response, Kim stated, "Your son did something terrible, right? Is it your son? I heard that he had depression. What did he do?" At trial, Yi sought to call Susan Yi to testify about the statement made by Kim. Yi contends the statement was relevant "because it was probative of whether [Yi] was genuinely mentally ill at the time of the offense." Alternatively, Yi contends the statement was not hearsay because it was not offered for the truth of the matter asserted.

Yi presented Kim's statement to bolster his argument that he was mentally ill. The problem with the statement being presented for that purpose is that there was no indication that Kim had any knowledge of the mental illness. Indeed, the statement by Kim was that she "heard" that Yi had depression. Kim did not have personal, first-hand knowledge that Yi had a mental illness. Instead, Kim merely expressed her opinion, based upon information received from other people, that Yi may have had a mental illness. Thus, the facts—Yi's mental illness— were not speaking through Kim; Kim was speaking about the facts. And, as the Supreme Court

- 20 -

has stated, the test as to whether a statement is spontaneous, and therefore an excited utterance, asks "whether the declaration was the facts talking through the party or the party talking about the facts." Upton v. Commonwealth, 172 Va. 654, 657-58, 2 S.E.2d 337, 339 (1939). As a result, the trial court found that the statement was not an excited utterance because "it[ is] not a statement about an event or condition. It[ is] a statement about her opinion." We agree with the trial court. Therefore, the trial court did not abuse its discretion by refusing to admit Kim's statement as an excited utterance.

## 2. Probative Value Versus Prejudicial Effect

Yi alternatively argues that the trial court erred in refusing to admit Kim's statement not for the truth of the matter asserted but rather to show that Kim made the statement. Assuming without deciding that Yi was not offering the statement for the truth of the matter asserted, we hold that the trial court properly concluded that the prejudicial effect of the statement outweighed its probative value.

If the prejudicial effect of admitting relevant evidence outweighs its probative value, then the evidence should be excluded. Evans-Smith v. Commonwealth, 5 Va. App. 188, 196, 361 S.E.2d 436, 441 (1987). "'[T]he responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal in the absence of a clear abuse.'" Ortiz v. Commonwealth, 276 Va. 705, 715, 667 S.E.2d 751, 757-58 (2008) (quoting Spencer v. Commonwealth, 240 Va. 78, 90, 393 S.E.2d 609, 617 (1990)).

Here, Yi seeks to clothe his excited utterance argument in the cloak of relevance. Yi, on brief, argues that the trial court should have admitted the statement because its probative value outweighs its prejudicial effect. In so arguing, Yi says that the statement is probative because it is evidence that Yi was known to be mentally ill on the date of the offense. This argument

requires the use of Kim's statement to prove the truth of the matter asserted—that Yi was mentally ill. For the reasons stated above, the statement cannot be so used. Excluding this cloaked, excited utterance argument, Yi offers no probative value for the statement. Accordingly, the trial court did not abuse its discretion by refusing to admit the statement.

III.

For the foregoing reasons, we affirm the judgment of the trial court.

<u>Affirmed.</u>