# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Humphreys, Malveaux and Fulton
Argued at Fredericksburg, Virginia


DAQUIL RAHEEM SMITH

v.        Record No. 0753-22-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE ROBERT J. HUMPHREYS
SEPTEMBER 12, 2023


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Tracy C. Hudson, Judge

Shalev Ben-Avraham, Senior Assistant Public Defender, for
appellant.

Collin C. Crookenden, Assistant Attorney General (Jason S. Miyares,
Attorney General; Katherine Quinlan Adelfio, Assistant Attorney
General, on brief) for appellee.


In a jury trial, Daquil Raheem Smith was convicted for voluntary manslaughter under Code

§ 18.2-35 and use of a firearm in commission of a felony under Code § 18.2-53.1.  The circuit court

sentenced Smith to 13 years of incarceration and an additional post-release suspended term of 6

years.  He contends on appeal that law enforcement unlawfully detained and arrested him in

violation of the Fourth Amendment and improperly questioned him in violation of the Fifth

Amendment, that the Commonwealth failed to present sufficient evidence to justify his convictions,

that the circuit court should have set aside his firearm conviction because of an inconsistent jury

verdict, and that the circuit court abused its discretion in imposing the sentence.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

I. Procedural History

In May of 2021, Smith was indicted for the premeditated murder of Matthew Costanzo and use of a firearm in the commission of that murder. Smith filed two pretrial motions to suppress evidence. The first alleged that his Fifth Amendment rights were violated when officers questioned Smith without first advising him of his *Miranda*[1] rights. The second argued that Smith's seizure and arrest violated his Fourth Amendment rights.

The circuit court found that Smith's initial questioning did not violate the Fourth or Fifth Amendment. However, when he was handcuffed the second time, he was in custody and the court suppressed statements he made prior to being advised of his *Miranda* rights. The circuit court then found Smith's arrest and post-arrest interview did not violate his Fourth or Fifth Amendment rights.

At trial, after the Commonwealth presented its case in chief, the circuit court granted Smith's motion to strike the first-degree murder charge, finding that the Commonwealth's evidence was insufficient to prove premeditation and reducing the charge to second-degree murder. After Smith presented evidence, the circuit court denied his renewed motion to strike, and the jury found Smith guilty of voluntary manslaughter and use of a firearm in the commission of a felony.

Smith filed a post-verdict motion to set aside the firearm conviction because the jury acquitted him of the underlying offense of murder. The circuit court denied that motion. After hearing the evidence on sentencing, the circuit court found that the brutal nature of the shooting warranted the full ten-year sentence permitted by statute for voluntary manslaughter, and also imposed the additional three years of mandatory incarceration for the felonious use of a firearm.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

II. Evidence Presented at Suppression Hearings and at Trial

"On appeal, we view the record in the light most favorable to the Commonwealth because it was the prevailing party below." *Delp v. Commonwealth*, 72 Va. App. 227, 230 (2020). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

On December 22, 2020, shortly after 9:00 p.m., Officer Paradis, a Prince William County police officer, was dispatched to the area of Tacket's Mill for a reported shooting. Reported information included that one of the shooters was a black male wearing a green hoodie, and the second shooter involved was a black male wearing a grey hoodie with a t-shirt and light blue jeans. On the way to the scene, Officer Paradis received a notification that a 911 caller reported a man running in the street in the area of Gorham Way, near Tacket's Mill, offering money for a ride because he "needed to escape."[2] The caller described him as a black man, who was out of breath, with short black hair and wearing blue jeans with holes.

Officer Paradis went to Gorham Way and Harpers Hill, a residential area approximately a half-mile from Tacket's Mill through the woods. There, at about 10:00 p.m., he observed Smith wandering aimlessly; Smith was wearing blue jeans and only a t-shirt despite the cold temperature. Smith was approximately 10 to 20 yards from the wood line connecting that residential area to the shooting location, and he appeared to be lost or in distress. Because Smith matched the description of one of the shooters, Officer Paradis detained him at gunpoint. Officer

---

[2] At trial, Caleb Gutierrez testified that while walking his dog on Gorham Way a man offered him cash to escape the area, and Gutierrez called police with a description.

Graham arrived as Officer Paradis detained Smith, and both officers drew their weapons. Officer Paradis informed Smith that he was detained but not under arrest and handcuffed him with Officer Graham's help.

Once Smith was handcuffed, Officers Paradis and Graham noticed that Smith's arms were scratched. When Officer Paradis asked about the scratches, Smith stated that someone had tried to rob him and his brother, the robber started shooting, and so Smith ran. The officers walked Smith to their vehicle and patted him down. During the pat down, Officer Graham asked Smith what was in his pocket, and Smith told him money. When asked why he still had money after he was robbed, Smith then stated that the assailant had tried to rob him. Neither officer removed anything from Smith's pockets.

Officer Paradis asked Smith where his brother was. Smith said his brother ran after getting shot and went to the hospital. Smith said his brother's name was Taron Watson. The officers received confirmation over the radio that Taron Thomas was on his way to the hospital.

The officers released Smith from the handcuffs and asked if he needed medical attention, but he refused. When asked again about the scratches on his arm, Smith confirmed he ran through the woods and discarded his orange Nike hoodie while running. Officer Graham then told him to "do us a favor and have a seat in the vehicle." After Smith sat, Officer Graham said, "you're not in any trouble at this time" and that they were still investigating what happened; Smith responded, "I understand." Officer Graham asked Smith to "do us a favor and cooperate with us" and they would supply Smith with anything he needed. The vehicle door remained open, and Officer Graham stood in the doorway opening a few feet from the car. While seated in the vehicle, Smith repeated that someone had tried to rob him in the parking lot of the Tacket's Mill McDonald's.

Officer Paradis heard over the radio that K9 units tracked one suspect to the wood line near where Paradis found Smith. A sergeant on scene instructed Officers Paradis and Graham to detain and handcuff Smith a second time.[3]

Detective Perla was also actively investigating the shooting. He initially went to the crime scene, where he confirmed that two people were shot inside a vehicle and were transported to the hospital. The police found a third person with a gunshot wound at a nearby Lidl store. After meeting with other officers at that location, Detective Perla went to the place where the police had detained Smith. He confirmed Smith's identity and then read Smith his *Miranda* rights. Smith confirmed he understood his rights and was willing to speak with Detective Perla. They spoke briefly on the scene.

After Smith was transported to the police station, he was placed in an interview room. Before questioning Smith, Detective Perla affirmed that he read Smith his *Miranda* rights earlier while Smith was in the police vehicle. During the conversation that followed, Smith stated that he and Taron Thomas wanted to buy marijuana that night; Thomas texted a dealer he knew, and they agreed to buy a half ounce of marijuana for $170. As Smith, Thomas, and a friend of Thomas drove to meet the dealer, the friend told Smith this dealer had a "bad reputation." Smith claimed that when the dealer arrived, Smith stayed in his own car while Thomas exited. Smith looked at his phone and then heard gunshots. Smith ran from the car and saw Thomas fall on the ground; Smith and the friend ran from the scene. Smith did not identify the friend but gave a detailed physical description of him. Smith maintained this version of events and wrote a witness statement to that

---

[3] The trial court excluded the statements Smith made in the vehicle after he was handcuffed the second time and before he was advised of his *Miranda* rights. The trial court found that police questioning of Smith, without the benefit of *Miranda* warnings, violated the Fifth Amendment because he was then "in custody" for purposes of *Miranda*. An investigatory stop may evolve into custodial interrogation, requiring *Miranda* warnings, without becoming a de facto arrest under the Fourth Amendment. *Dixon v. Commonwealth*, 270 Va. 34, 41 (2005).

effect. Smith remained handcuffed during the initial portion of the interview until the police released his hands to write the witness statement.

After he wrote the statement, Smith remained alone in the interview room for approximately thirty minutes, and he rested his head on the table on top of his arms. When Detective Perla reentered the room, he challenged Smith's story. Two hours into the interview, Smith admitted that he got into the dealer's vehicle to purchase marijuana and that after he pulled money out of his pocket the driver pulled out a firearm and started shooting. Smith claimed he ran from the car after the shooting started.

Eventually, Detective Cupka entered the interview room and engaged in the interrogation. After the police had interviewed Smith for a total of about four hours, he admitted that he fired a gun multiple times during the drug deal while he was in the backseat of the car. Smith said that he fired the gun in reaction to hearing other gunshots. Detectives Perla and Cupka interviewed Smith for another thirty minutes before ending the questioning. When the detectives left the room, Smith again put his head and arms down on the table. The interview lasted approximately four and a half hours.

At trial, Katelyn Lawmaster testified that she, Jonathan Hines, and Matthew Costanzo drove together in a Camry to the parking lot where Costanzo planned to sell marijuana. Costanzo drove the vehicle, Lawmaster sat in the front passenger seat, and Hines sat behind Costanzo. A BMW with three occupants parked nearby. One of those occupants then entered the Camry behind Lawmaster, but she could not identify him. Lawmaster testified that seconds after the person sat in the backseat, without any conversation between anyone, another person ran toward her door holding a gun, opened her door, and shot her. She was shot in the arm and stomach. She heard on-going gunfire after she was wounded. As soon as the shooting ended, the occupants of the other vehicle fled the scene.

During the incident, Costanzo was shot eight times, including five times in the back at close range, once in the chest, and once in each arm. He died from those wounds.

The Commonwealth introduced the entire video of Smith's police interview, including his initial written statement denying he was the shooter and his eventual admission that he fired his gun multiple times in the backseat of the Camry.

ANALYSIS

I. Motions to Suppress

"'In reviewing the denial of a motion to suppress, we "consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial."'" *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)). "It is the appellant's burden to show that when viewing the evidence in such a manner, the trial court committed reversible error." *Id.* (quoting *Hairston*, 67 Va. App. at 560). "While we are bound to review *de novo* the ultimate questions of reasonable suspicion and probable cause, we 'review findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021) (alteration in original) (footnote omitted) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

A. Smith's Fourth Amendment rights were not violated.

On appeal, Smith argues the circuit court erred in denying his motions to suppress evidence because the police violated his Fourth Amendment rights when they seized and detained him for investigation. For the reasons stated below, we find no error and affirm the circuit court's rulings that the police did not violate Smith's Fourth Amendment rights.

- 7 -

1.  Officers had reasonable articulable suspicion to detain Smith.

Smith first argues that the officers lacked reasonable articulable suspicion to detain him and doing so violated his Fourth Amendment rights. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Police may "make a brief investigatory stop of a person when the officer has a reasonable suspicion, based on objective facts, that criminal activity may be afoot." *Mason v. Commonwealth*, 291 Va. 362, 367 (2016). Whether reasonable, articulable suspicion to detain a person exists presents a mixed question of law and fact. *Lawson v. Commonwealth*, 55 Va. App. 549, 554 (2010). In resolving such questions, "we give deference to the factual findings of the trial court but independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements." *Jackson v. Commonwealth*, 267 Va. 666, 672 (2004).

Reasonable, articulable suspicion exists when "detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Bland v. Commonwealth*, 66 Va. App. 405, 413 (2016) (internal quotation marks and citations omitted) (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). It "can be established with information that is different in quantity or content than that required to establish probable cause . . . [and] from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990).

In determining whether reasonable suspicion exists, a court's review must be "based on an assessment of the totality of the circumstances." *Harris v. Commonwealth*, 276 Va. 689, 695 (2008). It is an objective question that does not turn on the subjective thoughts, but "allows

officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418); *see also Mason*, 291 Va. at 368.

Officers Paradis and Graham had sufficient reasonable articulable suspicion to detain Smith when they encountered him at the wood line near Gorham Way. At the time he was detained, law enforcement officers observed Smith wandering aimlessly at the edge of the woods connected to the scene of the crime 30 minutes after the shooting. He was lightly dressed in cold weather at 10:00 p.m. Smith's appearance matched the description of one of the shooters, but for the hoodie, which the officers could reasonably conclude he had discarded. A 911 caller reported that someone in the area was offering cash for a ride to "escape." All of these facts supported reasonable, articulable suspicion that Smith was involved in the shooting and, thus, his detention did not violate the Fourth Amendment.

We reject Smith's contention that because Officer Paradis did not personally view Smith engage in any criminal conduct, the officer lacked reasonable articulable suspicion to detain him. The "Fourth Amendment does not require a policeman . . . to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Christian v. Commonwealth*, 33 Va. App. 704, 713 (2000) (alteration in original) (quoting *Adams v. Williams*, 407 U.S. 143, 145 (1972)). "Detaining suspects expeditiously to avoid their possible flight or remaining at large promotes the government's interest in solving crimes and bringing offenders to justice." *Ford v. Commonwealth*, 28 Va. App. 249, 256 (1998) (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)). Prince William police had already responded to the scene of the nearby shooting, learned the description of two suspected shooters, and sent a radio transmission to be on the lookout for the suspects. Officer Paradis knew via radio transmission that other officers had

- 9 -

investigated the scene, confirmed this was a murder investigation involving three victims, and that multiple suspects fled the scene. Thus, he had reasonable articulable suspicion that Smith was involved in the criminal activity under investigation and was justified in detaining him.

Smith next argues that because two officers detained him at gunpoint with handcuffs he was effectively arrested, requiring probable cause rather than reasonable articulable suspicion. "Once an officer has lawfully stopped a suspect, he is 'authorized to take such steps as [are] reasonably necessary to protect [his and others'] personal safety and to maintain the status quo during the course of the stop.'" *Servis v. Commonwealth*, 6 Va. App. 507, 519 (1988) (alterations in original) (quoting *Hensley*, 469 U.S. at 235). "Brief, complete deprivations of a suspect's liberty," including handcuffing and the drawing of weapons, "'do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances.'" *Thomas v. Commonwealth*, 16 Va. App. 851, 857 (1993) (quoting *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989)), *adopted upon reh'g en banc*, 18 Va. App. 454, 455 (1994). "While the 'investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time,' the 'scope of the intrusion permitted will vary [with each case].'" *Id.* at 856-57 (alteration in original) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). The means must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004) (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985)).

Officers Paradis and Graham used methods to detain Smith that were reasonable under the circumstances. Officers Paradis and Graham were investigating a shooting in which an armed suspect had fled the scene. They had reasonable articulable suspicion that Smith was involved in the shooting and that he could be armed and dangerous. Thus, it was reasonable to

detain Smith at gunpoint and with handcuffs. Notwithstanding these measures, Officer Paradis instructed Smith that although he was being detained for investigative purposes, he was not under arrest. For these reasons, Smith's initial seizure did rise to the level of an arrest and did not violate the Fourth Amendment.

Relying on *Torres v. Madrid*, 141 S. Ct. 989 (2021), Smith asserts that any physical touching of a suspect by law enforcement automatically raises the interaction to a de facto arrest. The Supreme Court in *Torres* answered the specific question of whether contact with a bullet fired from a law enforcement officer when actively attempting an arrest was sufficient physical contact to qualify as a seizure implicating the Fourth Amendment. *Id.* at 993-94. The Supreme Court held that "[i]n addition to the requirement of intent to restrain, a seizure by force—absent submission—lasts only as long as the application of force." *Id.* at 999. This narrow holding does not, as Smith contends, overturn the principles of *Terry* permitting officers to engage in physical contact for investigative detentions without rising to the level of an arrest. *See Terry v. Ohio*, 392 U.S. 1, 29-31 (1968).

2. Smith's continued detention did not violate his Fourth Amendment rights.

Smith argues that even if the initial seizure was permissible, after he gave an innocent explanation that he was the victim of an attempted robbery the officers no longer had cause to detain him, and his continued detention therefore violated his Fourth Amendment rights. In reviewing the length of an investigatory detention, "we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 685-86.

"[T]he mere 'possibility of an innocent explanation' does not necessarily exclude a reasonable suspicion that the suspect might be violating the law." *Shifflett v. Commonwealth*, 58

- 11 -

Va. App. 732, 736 (2011) (quoting *Morris v. City of Va. Beach*, 58 Va. App. 173, 183 (2011)). A set of actions "perhaps innocent in itself" may still collectively create suspicious circumstances to justify further investigation. *Id.* at 737 (citing *Terry*, 392 U.S. at 22).

The original call for emergency service indicated that the perpetrators of the shooting fled the scene. The evidence outlined above, coupled with his own statements to law enforcement, indicated that Smith was one of the two fleeing from the shooting scene. While there was a possibility that Smith was innocent of criminal activity, his claimed explanation for his presence there did not negate the reasonable articulable suspicion that he was involved in the shooting. Smith's own statements indicated his involvement in a nearby shooting to some degree, and the officers were therefore reasonable in continuing his detention to fully investigate whether Smith was a perpetrator or victim of criminal conduct.

### 3. There was probable cause to arrest Smith.

Smith contends that at the time he was transported from the scene in police custody for interrogation, the officers lacked probable cause to arrest him, in violation of the Fourth Amendment. *Dunaway v. New York*, 442 U.S. 200, 216 (1979). "[P]robable cause to arrest exists where the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person . . . in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Hairston*, 67 Va. App. at 564 (alterations in original) (emphasis omitted) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Probable cause is a flexible, common-sense standard, requiring only a probability of criminal activity. *Slayton v. Commonwealth*, 41 Va. App. 101, 106 (2003). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). Additionally, probable cause is judged by "examin[ing] the events leading up

to the arrest[] and then decid[ing] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,'" meet the requisite standard. *Id.* at 56-57 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)); *see also Mason*, 291 Va. at 369 (noting that although probable cause must be based on "[a]rticulable" facts, the officer need not articulate those facts expressly or subjectively rely on them as the basis for his actions). "Unlike a factfinder at trial, 'reasonable law officers need not "resolve every doubt about a suspect's guilt before probable cause is established."'" *Joyce v. Commonwealth*, 56 Va. App. 646, 660 (2010) (*quoting Slayton*, 41 Va. App. at 107). Whether probable cause exists is determined by examining the "totality-of-the-circumstances." *Gates*, 462 U.S. at 238.

Smith argues that because the officers lacked probable cause at the time Smith was transported from the scene, his Fourth Amendment rights were violated. By the time of Smith's arrest, Detective Perla had visited the crime scene and verified that a shooting took place with multiple victims. One of the suspects was found with a gunshot wound at a nearby Lidl. The person found with a gunshot wound at Lidl was named Taron Thomas, and Smith gave the name Taron "Watson" as his brother and co-victim of the alleged robbery. A few hundred yards from that store, another individual reportedly offered cash for a ride to "escape" from the area. When Detective Perla arrived at the place where the police had detained Smith, Officer Paradis informed Perla of Paradis's interactions with Smith and Smith's statements about the attempted robbery. The police found Smith wandering aimlessly near the shooting location shortly after it occurred; his arms were scratched and he was underdressed in cold weather. He claimed to have been a victim of an attempted robbery and admitted he came from that shooting scene. From these facts, an objective police officer could reasonably believe there was a substantial chance that Smith was one of the suspects of the shooting incident. *Wesby*, 583 U.S. at 57 (quoting *Gates*, 462 U.S. at 243 n.13). For these reasons, we find that Smith's Fourth Amendment rights

- 13 -

were not violated when officers transported him to the police station, as there was probable cause justifying that seizure.

## B. Smith's Fifth Amendment rights were not violated.

Smith contends that the police violated his Fifth Amendment rights and the circuit court erred in refusing to suppress the statement he made at police headquarters.

The Fifth Amendment of the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." This privilege extends to individuals who are interrogated while in police custody. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). Thus, before law enforcement officers may question an individual who is in custody, the officers must provide the individual with the "now famous *Miranda* warnings." *Kuhne v. Commonwealth*, 61 Va. App. 79, 87 (2012). Statements obtained during custodial interrogation without *Miranda* warnings "generally will be subject to exclusion." *Anderson v. Commonwealth*, 279 Va. 85, 90-91 (2010). "Whether the circumstances of [a police interview] were such as to require *Miranda* warnings is a mixed question of law and fact." *Spinner v. Commonwealth*, 297 Va. 384, 392 (2019). Appellate courts "review such questions de novo but defer to the fact-finder's findings of historical fact unless they are plainly wrong or without evidence to support them." *Id.*

Smith argues that the evidence was insufficient to establish that Detective Perla read Smith his *Miranda* rights because Detective Perla did not record it with his body worn camera and, thus, violated his own department's procedures for advising suspects of their rights. We disagree. Although there was no audio recording of a recitation of *Miranda* rights, the evidence established that Detective Perla gave the *Miranda* warnings while Smith was detained in the vehicle, Smith waived his rights, and he chose to speak to the officer. Consistent with Detective Perla's testimony, Officer Graham's body worn camera showed that Perla removed a folder with a preprinted card

- 14 -

from his pocket when he approached Smith in the vehicle. Detective Perla testified that at 10:33 p.m. he pulled out his laminated *Miranda* card and read Smith his rights from that card. Smith confirmed that he understood his rights and wanted to talk to the detective. In light of this evidence, we find no basis to disturb the circuit court's finding of fact that Detective Perla properly advised Smith of his *Miranda* rights.

Smith argues that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. A defendant may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Miranda*, 384 U.S. at 444). "[T]he Commonwealth 'bears the burden of showing a knowing and intelligent waiver.'" *Tirado v. Commonwealth*, 296 Va. 15, 27 (2018) (quoting *Angel v. Commonwealth*, 281 Va. 248, 257-58 (2011)). "'[W]hether the waiver was made knowingly and intelligently is a question of fact,' and the circuit court's determination on this issue 'will not be set aside on appeal unless plainly wrong.'" *Id.* at 27-28 (alteration in original) (quoting *Angel*, 281 Va. at 258). "Courts may consider 'the defendant's age, education, language, alienage, experience with police, and whether the defendant stated that he understood his rights as read to him' to evaluate 'whether the defendant comprehended the plain meaning of the required warnings.'" *Keepers v. Commonwealth*, 72 Va. App. 17, 37 (2020) (quoting *Tirado*, 296 Va. at 29).

Although "a valid waiver will not be presumed simply from the silence of the accused[,] . . . *Miranda* neither requires a waiver to be in writing or verbally expressed, nor does it preclude the conclusion that a waiver occurred based on the suspect's course of conduct." *Angel*, 281 Va. at 259 (citing *Harrison v. Commonwealth*, 244 Va. 576, 582 (1992)). "As such, waiver may be inferred from the words and actions of the person being interrogated." *Thomas v. Commonwealth*, 72 Va. App. 560, 582 (2020) (citing *Harrison*, 244 Va. at 582).

Detective Perla testified that after he read Smith his *Miranda* rights, Smith responded that he understood his rights and wanted to talk.[4] After he was transported to police headquarters, Detective Perla reminded Smith that the officer had recited the *Miranda* warnings. Smith did not indicate that he did not wish to speak to Perla. At the time of his arrest, Smith was 19 years old and had experienced 3 prior arrests for unrelated conduct. Smith had no injuries other than scratches on his arms, for which he repeatedly refused medical treatment. There is no evidence in the record that Smith was under the influence of any mind-altering substances or mentally incapacitated. In fact, he communicated clearly with the officers from the moment he was detained through the end of his interview. The interview lasted four and a half hours, but Smith had four thirty-minute breaks during that time, and he was attentive and responsive when questioned. We find no basis to disturb the circuit court's conclusion that Smith knowingly and intelligently waived his *Miranda* rights.

Finally, Smith contends that his statement to the police was inadmissible because it was involuntary. Statements are made "voluntarily" when they are "the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran*, 475 U.S. at 421. "Although we defer to the court's findings of historical fact unless plainly wrong or without evidentiary support, we review the legal question of voluntariness *de novo*." *Keepers*, 72 Va. App. at 40 (alteration in original) (citing *Washington v. Commonwealth*, 43 Va. App. 291, 300 (2004)). To determine if "the statement was the product of an essentially free and unconstrained choice by its

---

[4] Any improper questioning without *Miranda* warnings before Smith's waiver did not render his waiver to Detective Perla invalid. "A subsequent statement made by a suspect after being properly advised of his *Miranda* rights is admissible even [if] the suspect has given an earlier unwarned, and inadmissible, statement." *Jenkins v.* Commonwealth, 244 Va. 445, 454-55 (1992). Smith did not confess during Officer Paradis's initial questioning, and there is no evidence in the record that the officers engaged in any improper or coordinated two-part questioning. His later interview statement "was not a product of compulsion" or "coercive tactics." *Id.* at 455.

maker," we consider the totality of the circumstances, "including not only the details of the interrogation, but also the characteristics of the accused." *Id.* (quoting *Novak v. Commonwealth*, 20 Va. App. 373, 386-87 (1995)). Such characteristics include his "age, intelligence, mental and physical condition, background and experience with the criminal justice system." *Id.* at 41 (quoting *Washington*, 43 Va. App. at 302-03). Police conduct is also relevant, such as "interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation." *Id.* (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)). "Coercive police activity is a 'necessary predicate' to finding that a confession was involuntary." *Thomas*, 72 Va. App. at 580 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

We reject Smith's claim that his statement was involuntary because the officers suggested he would be punished less severely if he confessed and appealed to Smith's religious preferences. Such circumstances do not invalidate the circuit court's findings or automatically render a defendant's statements involuntary. *See Rodgers v. Commonwealth*, 227 Va. 605, 613-17 (1984) (finding defendant's statements to be voluntary even though the interrogators told him to "cast aside the devil" and be "straight with God," and claimed that his truthfulness may favorably impact the prosecutor's decisions in the case). During his questioning, Smith "engaged in a cautious give-and-take," "answered those questions he wanted to answer and skirted those he did not want to answer," and ultimately "never broke down and became 'putty in the hands' of the interrogator or a 'parrot' for words put into his mouth." *Id.* at 616-17. The record contains no evidence of coercive conduct by the police. For these reasons, the circuit court's finding that Smith's will was not "overborne" during the interview is supported by facts in the record and entitled to deference, and we do not disturb it.

## II. Denial of Renewed Motion to Strike

Smith contends that the circuit court erred in denying his renewed motion to strike the evidence and reduce the charge of second-degree murder to voluntary manslaughter, thus necessitating a dismissal of the charge of using a firearm in the commission of a felony listed in Code § 18.2-53.1.[5] At the close of the evidence, Smith moved to strike the evidence and argued both that the evidence was insufficient to establish that he perpetrated the shooting, and, at most, the evidence supported no charge greater than voluntary manslaughter. Although the jury found him guilty of the lesser offense of voluntary manslaughter, he contends that the circuit court erred in sending the second-degree murder charge, and the accompanying firearm charge, to the jury.

"A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Linnon v. Commonwealth,* 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

---

[5] Under Code § 18.2-53.1, it is unlawful to use a firearm in the commission of murder, rape, and other named offenses, but not voluntary manslaughter.

A defendant is guilty of second-degree murder when he "willfully or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm." *Watson-Scott v. Commonwealth*, 298 Va. 251, 257 (2019) (quoting *Essex v. Commonwealth*, 228 Va. 273, 280-81 (1984)). Although the evidence must be sufficient to establish malice, it may be implied, and does not require proof of "a deliberate intent to kill." *Id.* Such malice "may be implied from the deliberate use of a deadly weapon." *Id.* at 256 (quoting *Warlitner v. Commonwealth*, 217 Va. 348, 349 (1976)).

There was sufficient evidence that Smith perpetrated the shooting. Smith does not dispute that the shooting occurred, or that he was present at the scene; rather, he argues that the Commonwealth did not disprove a reasonable hypothesis of innocence that the still-unidentified third person from the BMW was the actual perpetrator of the shooting from the rear of the Camry. However, a "rational trier of fact" may view Smith's statement that he fired multiple shots while in the backseat of the Camry as an admission that he was the shooter.

Smith next argues that even if the jury could find that he was involved in the shooting that resulted in Costanzo's death, the evidence did not support a finding of malice. Smith referred to Thomas as his brother, and acknowledged they agreed to purchase marijuana from Costanzo. Both Smith and Thomas carried firearms. Smith got in the backseat of the Camry before Thomas began firing at Costanzo and Lawmaster without any conversation between them. The evidence supports a finding that Smith shot Costanzo five times from the back. After the shooting, Smith lied to officers about what happened in a clear effort to protect himself. Therefore, a jury could have determined that Smith did not fire his gun out of reaction and fear, as he claimed to the police, but did so purposefully and with malice. Thus, the circuit court did not err in permitting the jury to consider the second-degree murder charge and, thus, the felonious use of a firearm charge.

III. Motion to Set Aside Inconsistent Verdict

Smith argues that because the jury found him guilty of voluntary manslaughter, and not murder, that their inconsistent verdict of using a firearm to commit murder must be set aside. Citing *Bundy v. Commonwealth*, 220 Va. 485 (1979) (per curiam), Smith argues the jury's finding of manslaughter, and not murder, requires that the use of firearm conviction be set aside because manslaughter is not one of the felonies enumerated in Code § 18.2-53.1. In the same vein, Smith complains that the verdict form language for the use of a firearm conviction was "legally wrong," because it convicts a person for using a firearm while in commission of a felony and not while committing one of the enumerated felonies listed in Code § 18.2-53.1.

We address the second part of Smith's argument first. *Bundy* does not require reversal as Smith asserts. The Supreme Court reversed Bundy's conviction because, based on the wording of the jury's verdict form, Bundy was convicted of using a firearm in the commission of a felony, which was a nonexistent offense at the time of his prosecution. *Id.* at 487-88. Bundy was charged with murder and use of a firearm while committing murder, but he was convicted of voluntary manslaughter and of "the use of a firearm in the commission of a felony," according to the verdict form. *Id.* at 486-87. The Court concluded that the "jury convicted the defendant of the non-existent offense" because the verdict form did not indicate one of the felonies enumerated in Code § 18.2-53.1. *Id.* at 488. Based on the wording of the verdict form, the jury could not have interpreted the verdict form as finding Bundy guilty of using a firearm *while committing murder*. *Id.* at 487.

Smith argues that the verdict form language in his case matches the erroneous language of the verdict form in *Bundy*. However, there is a distinction. In the present case, the verdict form that the circuit court submitted to the jury advised it to find Smith either guilty or not guilty of "Use or Display [of a] Firearm in Commission of a Felony, as charged in the indictment."

The indictment states in relevant part, "[Smith] did use or display a firearm in a threatening manner while committing or attempting to commit the murder of [Costanzo], in violation of [Code §] 18.2-53.1." Therefore, the verdict form *did* reference the predicate felony of murder by stating that the jury found him guilty of use of a firearm in commission of a felony "as charged in the indictment," and the indictment stated that Smith was charged with use of a firearm in the commission of murder. We find no error in the verdict form language.

The fact that Smith was convicted of manslaughter does not require the Court to reverse his conviction of use of a firearm in the commission of murder based on legal inconsistency. The Virginia Supreme Court has found that a defendant *can* be convicted of using a firearm while committing an enumerated felony in Code § 18.2-53.1 even when the jury finds him not guilty of the enumerated felony. *McQuinn v. Commonwealth*, 298 Va. 456, 461 (2020) (affirming convictions of use of a firearm in the commission of abduction and malicious wounding, even though jury did not find defendant guilty of the predicate offenses); *Reed v. Commonwealth*, 239 Va. 594 (1990) (affirming conviction for use of a firearm in the commission of a robbery even though jury found defendant not guilty of the underlying robbery). In *McQuinn* and *Reed* the "scenario is one in which the evidence is legally sufficient to convict the defendant of the predicate offense, but the jury has reached seemingly inconsistent (though not necessarily mutually exclusive) verdicts by convicting the defendant of the compound, but not the predicate, offense." *McQuinn*, 298 Va. at 459 (citing *Reed*, 239 Va. at 596-98). "In such cases, the apparently inconsistent verdicts must stand because the jury could have convicted the defendant on both charges but quite possibly decided not to do so out of a sense of grace and leniency." *Id.* The Court reiterated "that 'verdicts cannot be upset by speculation or inquiry' into whether they 'may have been the result of compromise, or of a mistake on the part of the jury.'" *Id.* (quoting *Reed*, 239 Va. at 597). The Court declined to depart from its precedent and

United States Supreme Court precedent allowing inconsistent verdicts in cases involving compound and predicate offenses:

> Because the jury (i) may have erred in failing to convict the defendant of the predicate offense while finding him guilty of the compound offense, or (ii) may have made a mistake in finding the defendant guilty of the compound offense while finding him not guilty of the predicate offense, or (iii) may have "simply decided to be lenient with the defendant" by convicting him only of the compound offense, "[i]nconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Commonwealth is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course."

*McQuinn*, 298 Va. at 460 (alteration in original) (emphases omitted) (quoting *Reed*, 239 Va. at 597-98).

Here, the evidence is sufficient to support a conviction of second-degree murder as discussed above. Therefore, we affirm Smith's conviction for use of a firearm in the commission of murder as charged in the indictment.

## IV. Abuse of Discretion in Sentencing

Smith contends that the circuit court erred in sentencing him to the maximum of 10 years of incarceration for voluntary manslaughter. He argues that because the victim fired his own firearm at the co-defendant in response to the co-defendant's shooting, the court improperly considered the victim as being "in a defenseless position" at the time he was killed and also failed to properly weigh mitigation evidence.

"We review the trial court's sentence for abuse of discretion." *Scott v. Commonwealth*, 58 Va. App. 35, 46 (2011). "[W]hen a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an

abuse of discretion." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)).

The sentence the circuit court imposed was within the range set by the legislature. *See* Code §§ 18.2-10(e) and 18.2-35. It was within the circuit court's purview to consider any mitigating factors presented by Smith. *See Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000). Accordingly, the circuit court did not abuse its discretion in imposing Smith's sentence, and we do not disturb it.

CONCLUSION

For the foregoing reasons, we affirm the decision of the circuit court.

*Affirmed*.